

**EXHIBIT B**

## LOAN AND SECURITY AGREEMENT

THIS LOAN AND SECURITY AGREEMENT (this "Agreement"), made as of the 30th day of August, 2007, by and between **INNOVATIVE HEALTHCARE PROPERTIES, LLC**, a Pennsylvania limited liability company ("Innovative"), **CENTER FOR RENAL CARE AT SHADYSIDE, LTD.**, a Pennsylvania corporation ("Center"), and **RESIDENCE FOR RENAL CARE AT SHADYSIDE, LTD.**, a Pennsylvania corporation ("Residence") (Innovative, Center and Residence are hereinafter from time to time referred to as the "Borrowers"), **CARE FIRST MANAGEMENT, LLC**, a Pennsylvania limited liability company ("Care First"), **J. GREGORY CAUTERUCCI, SR.**, a natural person residing in Pennsylvania ("Cauterucci"), **PHILLIP H. KRAUSE**, a natural person residing in Pennsylvania ("Krause"), **ROBERT K. NEALON**, a natural person residing in Pennsylvania ("Nealon"), **VICTOR J. BIERMAN III**, a natural person residing in Ohio ("Bierman"), **DAVID P. LEONE**, a natural person residing in Ohio ("Leone"), **BINA MEHTA**, a natural person residing in Ohio ("Mehta"), **JOHN Y. KIM**, a natural person residing in Ohio ("Kim"), **LOUIS J. CAPOZZI**, a natural person residing in Pennsylvania ("Capozzi"), and **VINCENT E. FISHER**, a natural person residing in Ohio ("Fisher") (Care First, Cauterucci, Krause, Nealon, Bierman, Leone, Mehta, Kim, Capozzi, and Fisher are collectively referred to as the "Guarantors") and **FIRSTMERIT BANK, N.A.**, a national banking association ("Lender").

### RECITALS

A. The Borrowers have applied to Lender, and Lender has agreed to grant to the Borrowers, subject to the terms and conditions of this Agreement, certain credit facilities in the aggregate amount of Two Million Eight Hundred Thirteen Thousand Seven Hundred and no/100 ($2,813,700.00), (the "Loan") to be used by the Borrowers subject to the terms of this Agreement.

B. Except as otherwise expressly set forth herein, it is hereby agreed by the parties that this Agreement supersedes and cancels in all respects any application or other writings or communications between the Borrowers and Lender garding the Loan; and

C. Lender is willing to make the Loan to the Borrowers on the terms and conditions hereafter set forth based upon and in reliance on the Borrowers' and Guarantors' creditworthiness, and on the value of the Premises (as hereinafter defined) and the Collateral (as hereinafter defined) on the date hereof as same is subjected to the mortgages from Innovative.

NOW, THEREFORE, in consideration of the Loan and the premises, and of the mutual covenants and agreements set forth below, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the Borrowers and Lender hereby agree as follows:

1. **Incorporation of Recitals.** The Recitals portion of this Agreement is hereby incorporated by this reference as though it were fully set forth and rewritten herein and the affirmative statements therein contained shall be deemed to be representations of the Borrowers to Lender that are hereby ratified and confirmed.

2. **Definitions.** In addition to the terms defined in the Recitals portion of this Agreement, as used in this Agreement the terms listed below shall have the following meanings unless the context otherwise requires:

Account Debtor. The Person who is obligated on an account receivable.

Affiliate. As to any Person, (i) the spouse, parent, child, grandchild or sibling of any individual Person, or any other relative who lives in the same house with, or is a dependent of (under the Internal Revenue Code of 1986, as amended), such Person (ii) any general or limited partnership in which such Person or any individual identified in clause (i) or entity identified in clause (iii), (iv) or (v) is a general partner or in which any such Person, individual or entity owns, beneficially or of record, more than 10% of the limited partnership interest; (iii) any corporation in which such Person or individual identified in clause (i) is a director or officer, or which any such Person, or any individual or entity .utified in clauses (i), (ii), (iv) or (v) is the owner, beneficially or of record, of 10% or more of its outstanding voting stock; (iv) any trust of which any such Person, or any individual or entity identified in clauses (i), (ii), (iii) or (v) is a trustee or co-trustee or is the holder, beneficially or of record, of a beneficial interest of 10% or more; or (v) any corporation,

partnership, limited liability company, trust or other entity controlled by, controlling or under common control with, either directly or indirectly, such Person or any of the individuals or entities identified in clauses (i) through (iv) above.

Assignment of Licenses. The Assignments of Licenses of even date herewith from the Borrowers in favor of or for the benefit of Lender and relating to the Premises and the Permits, securing payment and performance under the Loan Documents, which shall be a valid first security interest on the property described therein, as the same may from time to time be amended, modified, supplemented, substituted, extended, revised or restated.

Assignment of Rents. The Assignments of Rents and Leases included in the mortgages from Innovative in favor of or for the benefit of Lender and relating to the Premises, securing payment and performance under the Loan Documents, which shall be a valid first security interest as to the Borrowers on the property described therein, as the same may from time to time be amended, modified, supplemented, substituted, extended, revised or restated.

Borrowing Base. Is defined as seventy five percent (75%) of the Borrowers' Eligible Accounts, as that term is herein defined.

Borrowing Base Certificate. Certificate acceptable to the Bank in substantially the form attached hereto as Exhibit "E."

Closing or Closing Date. The closing herein referred to as the "loan closing," "date of closing," "closing" or words of similar import, shall occur on or before August 30, 2007, at the offices of the Title Insurer, or at such other place as Lender may reasonably require.

Collateral. The property referred to in Paragraph 5 hereof.

Debt Coverage Ratio. Is defined as ((Net Income + Depreciation + Interest Expense) – (Dividends and Distributions) divided by (annual principal and interest payments), for like periods.

"Eligible Accounts" means at any time, all Accounts (as "Accounts" is defined in each applicable the Security Agreement) of Innovative, Residence, and Center which contain selling terms and conditions reasonably acceptable to Bank. The net amount of any Eligible Account against which Borrowers may borrow under the Loans shall exclude all returns, discounts, credits, and offsets of any nature. Unless otherwise agreed to by Bank in writing, Eligible Accounts do not include:

(a) Accounts from Medicare, Medicaid or Reimbursement Contracts which have not been paid in full within under 120 days from the invoice date. The entire balance of any Account of any single Account Debtor relating to Medicare, Medicaid or Reimbursement Contracts will be ineligible whenever the portion of the Account which has not been paid within under 120 days from the invoice date is in excess of 50% of the total amount outstanding on the Account.

(b) Except as otherwise provided in clause (a) above, Accounts which have not been paid in full within under 90 days from the invoice date. The entire balance of any Account of any single Account Debtor will be ineligible whenever the portion of the Account which has not been paid within under 90 days from the invoice date is in excess of 50% of the total amount outstanding on the Account.

(c) Accounts with respect to which the Account Debtor is an Affiliate, employee or agent of any Borrowers.

(d) Accounts with respect to which the Account Debtor is a subsidiary of, or affiliated with any Borrowers or its respective members, officers, or managers.

(e) Accounts with respect to which goods are placed on consignment, guaranteed sale, or other terms by reason of which the payment by the Account Debtor may be conditional.

2

(f)     Accounts with respect to which the Account Debtor is not a resident of the United States, except to the extent such Accounts are supported by insurance, bonds or other assurances satisfactory to Bank.

(g)     Accounts which are subject to dispute, counterclaim or setoff.

(h)     Accounts with respect to which the goods have not been shipped or delivered, or the services have not been rendered, to the Account Debtor.

(i)     Accounts with respect to which Bank, in its sole discretion, deems the creditworthiness or financial condition of the Account Debtor to be unsatisfactory.

(j)     Accounts of any Account Debtor who has filed or has had filed against it a petition in bankruptcy or an application for relief under any provision of any state or federal bankruptcy, insolvency, or debtor-in-relief acts; or who has had appointed a trustee, custodian, or receiver for the assets of such Account Debtor; or who has made an assignment for the benefit of creditors or has become insolvent or fails generally to pay its debts (including its payrolls) as such debts become due.

Environmental Agreement.  The Environmental Indemnity Agreement of even date herewith from the Borrowers and Guarantors in favor of or for the benefit of Lender relating to the Premises, as the same may from time to time be amended, modified, supplemented, substituted, extended, revised or restated.

Environmental Permit.  Any permit, license, or other authorization issued under any Hazardous Materials Law with respect to any activities or businesses conducted on or in relation to the Premises.

Facility.  That certain: (i) sixty-four (64)-bed licensed skilled nursing facility known as "Residence for Renal Care at Shadyside" located at 5511 Baum Boulevard, Pittsburgh, Pennsylvania 15232 Allegheny County.

GAAP.  Except as otherwise set forth herein, all computations and determinations as to accounting or financial matters shall be made in accordance with generally accepted accounting principles consistently applied, and all accounting or financial terms shall have the meanings ascribed thereto.

Guarantors.  Care First, Cauterucci, Krause, Nealon, Bierman, Leone, Mehta, Kim, Capozzi, and Fisher.

Guaranty.  The Guaranties of even date herewith from Guarantors in favor of Lender and referred to in Paragraph 7 hereof, as the same may from time to time be amended, modified, supplemented, substituted, extended, revised or restated.

Hazardous Materials.  Petroleum and petroleum products and compounds containing them, including gasoline, diesel fuel and oil; explosives; flammable materials; radioactive materials; polychlorinated biphenyls ("PCBs") and compounds containing them; lead and lead-based paint, asbestos or asbestos-containing materials in any form that is or could become friable; underground storage tanks, whether empty or containing any substance; any substance the presence of which on the Premises is prohibited by any federal, state or local authority; any substance that requires special handling; and any other material or substance now or in the future defined as a "hazardous substance," "hazardous material," "hazardous waste," "toxic substance," "toxic pollutant," "contaminant," or "pollutant" within the meaning of any Hazardous Materials Law.

Hazardous Materials Laws.  All federal, state, and local laws, ordinances and regulations and standards, rules, policies and other governmental requirements, administrative rulings and court judgments and decrees in effect now or in the future and including all amendments, that relate to Hazardous Materials and apply to Borrower or to the Premises. Hazardous Materials Laws include, but are not limited to, the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. Section 9601, et seq., the Resource Conservation and Recovery Act,. 42 U.S.C. Section 6901, et seq., the Toxic Substance Control Act, 15 U.S.C. Section 2601, et seq., the Clean Water Act, 33 U.S.C. Section 1251, et seq., and the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, and their state analogs.

3

**Improvements.** All buildings, structures, fixtures, and improvements of every nature whatsoever now or hereafter situated on or about the Premises, including, but not limited to, the Permits, all gas and electric fixtures, radiators, heaters, engines and machinery, boilers, ranges, elevators and motors, plumbing and heating fixtures, carpeting and other floor coverings, water heaters, awnings and storm sashes, and cleaning apparatus which are or shall be attached to the Premises or said buildings, structures or improvements.

**Indebtedness.** Includes (i) all items which in accordance with generally accepted accounting principles would be included in determining total liabilities on a consolidated basis as shown on the liability side of a balance sheet as at the date as of which indebtedness is to be determined, (ii) all indebtedness secured by any mortgage, pledge, lien or conditional sale or other title retention agreement to which any property or asset owned or held is subject, whether or not the indebtedness secured thereby shall have been assumed (excluding non-capitalized leases which may amount to title retention agreements but including capitalized leases), and (iii) all indebtedness of others which the Borrowers have directly or indirectly guaranteed, endorsed (otherwise than for collection or deposit in the ordinary course of business), discounted or sold with recourse or agreed (contingently or otherwise) to purchase or repurchase or otherwise acquire, or in respect of which the Borrowers have agreed to supply or advance funds (whether by way of loan, stock purchase, capital contribution or otherwise) or otherwise to become directly or indirectly liable and shall specifically include, but shall not be limited to, all indebtedness under this Agreement and the Notes.

**Leases.** Collectively, the leases relating to the Premises by and between: (i) Innovative and Residence; (ii) Innovative and Center.

**Lease Subordinations.** Collectively, the subordination, non-disturbance and attornment agreements in favor of Lender regarding the subordinations of the Leases, upon such terms and conditions as Lender shall require, by: (i) Innovative and Residence; (ii) Innovative and Center.

**Loans.** The Loans from Lender to the Borrowers referred to in Paragraph 3 hereof as evidenced by the Notes.

**Loan Documents.** The executed originals of all documents and instruments evidencing and/or securing the Loan and all documents and instruments incidental or collateral thereto, including without limitation, the Notes, Mortgages, this Agreement, Assignments of Licenses, Lease Subordinations, Security Agreements, Environmental Agreement, Guaranties, any other assignments of permits, assignments of contracts, assignment of rents, performance bonds, applications, guarantees, security and loan agreements, financing statements, disclosure statements, loan settlement statements, letters of credit, legal opinions, certificates and affidavits, and any other documents pertaining thereto, and the documents referred to in any loan agreement or loan commitment and related security agreements, all as the same now exist and may hereafter be amended, and all modifications or extensions of or replacements or substitutions for, in whole or in part, any of same, and any such documents or instruments subsequently executed and delivered, all of which must be in form and substance satisfactory to Lender, and any and all agreements, instruments, papers and documents heretofore, now or hereafter executed by the Borrowers and/or Guarantors or delivered to Lender with respect to the transactions contemplated by this Agreement.

**Managed Care Plans.** Any health maintenance organization, preferred provider organization, individual practice association, competitive medical plan, or similar arrangement, entity, organization, or Person;

**Medicaid.** That certain program of medical assistance, funded jointly by the federal government and the states, for impoverished individuals who are aged, blind and/or disabled, and/or members of families with dependent children, which program is more fully described in Title XIX of the Social Security Act (42 U.S.C. §§ 1396 *et seq.*) and the regulations promulgated thereunder;

**Medicare.** That certain federal program providing health insurance for eligible elderly and other individuals, under which physicians, hospitals, skilled nursing homes, home health care and other providers are reimbursed for certain covered services they provide to the beneficiaries of such program, which program is more fully described in Title XVIII of the Social Security Act (42 U.S.C. §§ 1395 *et seq.*) and the regulations promulgated thereunder;

4

**Mortgages.** The Open-End Mortgage, Security Agreement, Fixture Filing, and Assignment of Leases and Rents of even date herewith from Innovative for $1,361,000.00, Second Mortgage for $952,700.00, and Third Mortgage for $500,000.00 in favor of and for the benefit of Lender securing payment and performance under the Loan Documents, which shall be valid mortgage liens as to the Borrowers encumbering the Premises and all Improvements and fixtures located or to be located on, at, or under, or used in connection with the Premises, as the same may from time to time be amended, modified, supplemented, substituted, extended, revised or restated.

**Net Worth.** With respect to a Person shall, as of any date, mean the total assets of that Person less the total liabilities of that Person as determined in accordance with GAAP.

**Notes.** The Promissory Notes of even date herewith from the Borrowers payable to the order of Lender in the principal amount of One Million Three Hundred Sixty One Thousand and no/100 Dollars ($1,361,000.00), Nine Hundred Fifty Two Thousand Seven Hundred and no/100 Dollars ($952,700.00), and Five Hundred Thousand and no/100 Dollars ($500,000.00), evidencing the Loan, as the same may from time to time be amended, modified, supplemented, substituted, extended, revised or restated.

**Obligations.** Includes the Loans and any and all other indebtedness, advances, obligations, covenants, undertakings and liabilities of the Borrowers (including modifications, extensions, restatements, supplements and renewals thereof) to Lender, now existing or hereafter arising under the Loan Documents, whether several, joint, or joint and several, due or to become due, matured or unmatured, absolute or contingent, participated in whole or in part, whether evidenced or created by promissory note, guaranties, agreements or otherwise, in any manner acquired by or accruing to Lender, whether by agreement, assignment or otherwise, and whether or not presently contemplated by the parties on the date hereof, including all costs and expenses incurred in the collection of such indebtedness or the Loan, taxes levied, insurance and repairs to or for the maintenance of the Collateral hereinafter described.

**Permits.** All licenses, permits, certificates, certifications, franchises, agreements, provider agreements, provider numbers, and third party payor agreements of the Borrowers used or necessary in connection with the ownership, operation, management, use or occupancy of the Premises and the Facility as a sixty-four (64) bed licensed nursing home facility, and including, without limitation, business licenses, state health department licenses, food service licenses, licenses to conduct business, licenses to operate nursing home facility beds, certificates of need, operating rights, and all such other permits, licenses and rights, obtained from any governmental, quasi-governmental or private person or entity whatsoever concerning ownership, operation, management, use or occupancy of the Premises; and

**Person.** An individual, partnership, corporation, trust, association, company, limited liability company or partnership, governmental agency or any other entity.

**Premises.** The real property located at or about 5511 Baum Boulevard, Pittsburgh, Pennsylvania 15232, Allegheny County described on **Exhibit "A-1"** attached hereto and incorporated herein by this reference; together with the Facility, all buildings, structures, the Improvements, fixtures, easements, hereditaments and appurtenances thereunto belonging and owned by Borrowers.

**Reimbursement Contracts.** All third-party reimbursement contracts of the Borrowers relating to the Premises which are now or hereafter in effect with respect to residents qualifying for coverage under the same, including Medicare and Medicaid, Managed Care Plans and private insurance agreements, and any successor program or other similar reimbursement program and/or private insurance agreements, now or hereafter existing.

**Security Agreements.** The Security Agreements of even date herewith from the Borrowers and Care First in favor of or for the benefit of Lender and relating to the Premises, securing payment and performance under the Loan Documents, which shall be a valid first security interest as to the Borrowers and Care First on the property described therein, as the same may from time to time be amended, modified, supplemented, substituted, extended, revised or restated.

**Title Insurer.** First American Title Insurance Company, by and through The Talon Group, 50 South Main Street, Suite 705, Akron, Ohio 44308, Attention: Michael Schoenewald.

Capitalized terms not defined herein shall have the meanings set forth in the Mortgages. Any accounting term not otherwise defined herein shall be deemed to be used in accordance with generally accepted accounting principles consistently applied. Unless the context otherwise requires, the words "herein," "hereunder," "hereto," and "hereof" shall be deemed to refer to this entire Agreement and not merely to a paragraph, section, or portion hereof. The use of any gender shall be deemed to include any other gender, and any use of the singular or plural number shall be deemed to include either singular or plural, as the context may require.

3. **Loans**. Lender hereby agrees to lend to the Borrowers on a term loan basis the sum of One Million Three Hundred Sixty-One Thousand and no/100 Dollars ($1,361,000.00), and on a term loan basis the sum of Nine Hundred Fifty-Two Thousand Seven Hundred and no/100 Dollars ($952,700.00), and on a line of credit basis the sum of Five Hundred Thousand and no/100 Dollars ($500,000.00), on the terms and conditions hereinafter set forth.

4. **Loan Terms**. The specific provisions of the Loan, including but not limited to, rate of interest, term, late charges, prepayment rights and default rate of interest are contained in the Notes and are incorporated herein by this reference.

5. **Security Interest**.

The Notes shall be secured by (a) a first mortgage granted by Innovative and a second mortgage granted by Innovative, and a third mortgage granted by Innovative to Lender encumbering and conveying the Premises, which Mortgages shall constitute valid mortgage liens on the Premises, subject only to permitted encumbrances as are expressly approved by Lender and set forth as an exhibit to the Mortgages (hereinafter collectively referred to as the "Permitted Encumbrances"); (b) Assignments of Licenses granting a security interest in the property described therein; and (c) Security Agreements granted by Borrowers and Care First to Lender granting valid security interests in and to all of the Borrowers' and Care First's business assets and properties, including but not limited to inventory, accounts receivable, equipment, general intangible, tangible and intangible personal property and products and proceeds thereof.

To further secure the performance of all obligations under this Agreement and the Loan Documents, the Borrowers and Care First hereby grant in favor of Lender continuing security interests in and to all of the following items of property, namely, all fixtures, personal property, intangible property and other rights, and products and proceeds thereof with respect to the Premises, which are described in **Exhibit "B"** attached hereto and incorporated herein by this reference (all of such items together with the items referred to in the Security Agreements being herein collectively referred to as the "Collateral"), which are now owned or hereafter acquired by the Borrowers and Care First, or in which the Borrowers and Care First may now or hereafter have any right or interest, and which is located, installed, constructed, affixed, attached, placed, contained or used in, on or about, or used or intended to be used in connection with the ownership, operation, leasing and management of, or otherwise related to, the Premises. Lender shall have all the rights and remedies of a secured party under the Uniform Commercial Code, as in effect from time to time in the Commonwealth of Pennsylvania. The Borrowers and Care First confirm that this Agreement is also a security agreement under the Uniform Commercial Code, as in effect from time to time (the "Code") or other applicable law of the state where the Collateral is located for any and all of the items described herein that are a part of the Collateral, and any products and proceeds thereof, which may be subject to a security interest under the Code or such other applicable law. The Borrowers and Care First Care authorize Lender to file on their behalf without execution by the Borrowers and Care First all financing statements with respect to the Collateral which Lender requires to perfect its security interest therein, and the Borrowers shall pay the expense of filing such documents. The covenants and agreements of Borrowers and Care First throughout this Agreement shall apply to all items of Collateral which are subject to the security interest granted herein. Separate financing statements may be filed with respect to the Security Agreements to properly reflect the priority of the lien against the Borrowers' and Care First's accounts receivable as set forth in the Security Agreements.

As used herein, the term "Collateral" shall also include the Premises (and all improvements thereto now or hereafter existing), the title insurance referred to in Paragraph 6 hereof and all of the Borrowers' and Care First's right, title and interest in any sums, documents or instruments at any time credited by or due to the Borrowers and Care First or in the possession of Lender. Upon an Event of Default, after the expiration of any applicable cure period, if any, the Borrowers and Care First each authorize Lender to appropriate and use any of the Collateral or proceeds of the Collateral referred to in this Paragraph 5 in which Lender has a security interest or of which it has possession and any of the sums, documents or instruments referred to in this sentence or the proceeds thereof for application against the Obligations. Borrowers and Care

6

First shall not sell, assign, lease, except as permitted in the Assignment of Rents, transfer or grant a security interest to any other person in, or otherwise encumber, the Collateral and sums covered by this Paragraph 5 except in favor of Lender. Further, the Borrowers and Care First shall unconditionally assign to Lender all leases, rents, issues, profits, revenues and other benefits of the Premises. Further, Residence and Center shall unconditionally assign to Lender all licenses, Permits and certifications of Residence and Center with respect to the Facility pursuant to the Assignment of Licenses. In connection with any disposition of any of the Collateral by Lender, Lender may communicate to the purchaser a record that Lender disclaims or modifies warranties of title or the like, and doing so will not be considered adversely to affect the commercial reasonableness of any sale of any of the Collateral. Except for the Leases, the Borrowers shall not lease or license any of the Collateral. In connection with any disposition of any of the Collateral by Lender, Lender may communicate to the purchaser a record that Lender disclaims or modifies warranties of title or the like, and doing so will not be considered adversely to affect the commercial reasonableness of any sale of any of the Collateral. Except for the Leases, the Borrowers and Care First shall not lease or license any of the Collateral. The Borrowers and Care First agree that Lender's compliance with any applicable state or federal law requirements in connection with the disposition of the Collateral will not adversely affect the commercial reasonableness of any sale of the Collateral.

6.    **Evidence of Title.** (a) Prior to closing, the Borrowers shall furnish to Lender an ALTA Mortgagee's Title Insurance Commitment (additional coverage form) written by the Title Insurer, which indicates that the Borrowers have good and marketable title in the Premises. At closing, or as soon thereafter as may be reasonably practicable, the Borrowers shall cause the Title Insurer to deliver to Lender an original ALTA Loan Policy of Title Insurance with standard mortgage endorsements, written on the aforesaid commitment, which shall show that Innovative has good and marketable title to the Premises and that the Mortgages are the first lien on the Premises. Said loan policy shall include a Comprehensive Endorsement (ALTA Form 9), and such other endorsements as may be reasonably required by Lender, issued by Title Insurer in an amount equal to $2,813,700.00, which title insurance policies shall show full legal and equitable title to the Premises to be vested in Innovative and insure that the Mortgages are valid mortgages as to Innovative encumbering the Premises, subject only to liens, encumbrances, easements, reservations, restrictions, exceptions and real estate taxes which are a lien but not yet due and payable, and permitted by the Mortgages or approved in writing by Lender. It shall be a condition of closing that the standard printed exceptions be deleted from the title policy including the "gap", matters that would be shown by an accurate survey or inspection and matters relating to any lien or right to lien for services, labor or materials furnished to the Premises. In addition, said loan policy shall also include in its coverage affirmative insurance against: (a) mechanic's and materialmen's liens; (b) rights of parties in possession; and (c) encroachments by or on the Premises. In addition, said loan policy shall provide affirmative insurance of ingress and egress to a publicly-dedicated street with respect to the Premises. Both said commitment and the title policy written thereon shall show Lender as the insured, shall be in an insured amount of not less than $2,813,700.00 and shall contain no exceptions (standard or otherwise) except those specifically approved by Lender. The cost and expense of the evidence of title described in this Paragraph shall be paid by the Borrowers at closing. (b) At closing, or as soon thereafter as may be reasonably practicable, Innovative shall furnish to Lender an updated lien search performed by the Title Insurer, which indicates that Innovative has good and marketable title in the Premises and that the Mortgages are valid liens on the Premises.

7.    **Guaranty.** At closing, Guarantors shall execute the Guaranties by which Guarantors shall irrevocably and unconditionally guaranty to Lender, the payment of all Obligations and performance of the Borrowers' Obligations hereunder and under the Loan Documents, except as specifically limited in such Guaranty.

8.    **Financial Statements, Reporting Requirements, Books and Records.**

(a)    So long as any of the Obligations to Lender are outstanding, the Borrowers shall maintain a standard and modern system for accounting in accordance with GAAP and shall furnish and pursuant to the Lease, cause Tenant to furnish to Lender:

(i) On a quarterly basis and within one hundred twenty (120) days after the end of each fiscal year, a copy of a "compilation" financial statement (including balance sheet and income statement), prepared on a "roll-up" basis to include the Borrowers and any Affiliate of the Borrowers, for the year then ended, prepared by an independent certified public accountant, reasonably satisfactory to Lender;

7

(ii) Within one hundred twenty (120) days after the end of each fiscal or calendar year, as applicable, a copy of the Borrowers' and Guarantors' federal income tax return for the year then ended, or if such income tax return is then under extension, a copy of such income tax extension form within thirty (30) days of filing of same, followed by a copy of such applicable income tax return within thirty (30) days after filing;

(iii) With the statements submitted under (ii) above, a certificate signed by an officer of the Borrowers, (A) stating he or she is familiar with all documents relating to the Borrowers and that no Event of Default exists as specified in this Agreement, nor any event which upon notice or lapse of time or both would constitute such an Event of Default, has occurred, or if any such conditions or event existed or exists, specifying it and describing what action the Borrowers have taken or proposes to take with respect thereto, and (B) setting forth, in summary form, figures showing financial covenant compliance, in form and substance reasonably acceptable to Lender;

(iv) Forthwith upon the Borrowers obtaining knowledge of any condition or event which constitutes or, after notice or lapse of time or both, would constitute an Event of Default, a certificate of the Borrowers specifying the nature and period of the existence thereof, and what action the Borrowers have taken or is taking or proposes to take in respect thereof;

(v) Within one hundred twenty (120) days after the end of each calendar year, current personal financial statements from Guarantors, in such form and detail as Lender shall reasonably require;

(vi) With reasonable promptness, such other financial and tax information of the Borrowers and Guarantors as Lender may reasonably request from time to time;

(vii) Within ten (10) days of when due, evidence of the timely payment of all real estate taxes and assessments with respect to the Premises; and

(b) In addition to the foregoing, the Borrowers and Guarantors shall make or cause to be made available to Lender or their respective officers, agents, representatives and designees, to the fullest extent permitted by law, such books, records and reports (including, but not limited to, rent rolls, leases and income tax returns) that in any way may reasonably pertain to said parties' financial condition, the Premises, or status of the Loan, at all reasonable times upon reasonable and prior written request therefor from time to time made by Lender.

9. **Survey, Legal Description and Flood Zone Certification.** Prior to closing, the Borrowers shall furnish to Lender (at the Borrowers' cost and expense) two (2) copies of an ALTA boundary survey of the Premises (including the location of the Premises in relation to a duly dedicated public street or roadway which affords ingress and egress to the Premises) which shall be certified by a Pennsylvania and Ohio registered surveyor, respectively and which shall correctly depict and show (course bearings and distances) the Premises and the location of same in relation to readily identifiable major streets and highways. The survey shall also show: easements (with recording references to correspond with all easements reflected in the title insurance commitment required in accordance with Paragraph 6 hereof) and proposed easements, if any; location and dimensions of existing and proposed streets, roads, ramps, highways and alleys; the location and dimensions of existing and proposed building set-back lines, improvements, structures and sublots (including parking areas, driveways and walkways); utilities; encroachments by or on the Premises; curb cuts or entrance-ways which have been approved by the appropriate authorities having jurisdiction over the Premises; and a metes and bounds description of the Premises with certification of total area of land. The Lender shall obtain, at the Borrowers' expense, a certificate from an independent party indicating the flood zone classification with respect to the Premises. Notwithstanding the foregoing, Lender may, in its sole discretion, accept a location survey with respect to the Premises in lieu of the aforesaid ALTA survey. The survey and flood zone certificate shall be in such form and substance, and prepared by firms or individuals, as may be reasonably satisfactory to Lender.

10. **Loan Fees.**

(a) $1,361,000.00 Term Loan. The Borrowers shall pay to Lender a loan fee in the amount of Six Thousand Eight Hundred and Five no/100 Dollars ($6,805.00), for committing the Loan (the "Loan Fee"), plus out of pocket fees, including Small Business Administration fees, with $6,800.00 having already been paid prior to the time of

closing, which shall be due and payable at closing and such Loan Fee shall be deemed earned upon payment thereof and shall be non-refundable.

(b) $952,700.00 Term Loan. The Borrowers shall pay to Lender a loan fee in the amount of Four Thousand Seven Hundred Sixty Three and 50/100 Dollars ($4,763.50), for committing the Loan (the "Loan Fee"), plus out of pocket fees, including Small Business Administration fees which shall be due and payable at closing and such Loan Fee shall be deemed earned upon payment thereof and shall be non-refundable.

(c) $500,000.00 Line Of Credit Loan. The Borrowers shall pay to Lender a loan fee in the amount of One Thousand and no/100 Dollars ($1,000.00), for committing the Loan (the "Loan Fee"), plus out of pocket fees which shall be due and payable at closing and such Loan Fee shall be deemed earned upon payment thereof and shall be non-refundable.

11. **Representations, Warranties and Undertakings**.

(a) The Borrowers hereby represent, warrant and covenant to Lender as follows:

(i) Residence and Center are corporations duly incorporated, validly existing and in full force and effect under the laws of the Commonwealth of Pennsylvania. Innovative is a limited liability company duly organized, validly existing and in full forced and effect under the laws of the Commonwealth of Pennsylvania. Borrowers are qualified and authorized to do business and are in good standing in all other states and jurisdictions where the character of its property or the nature of its activities make such qualification necessary.

(ii) The Borrowers have the right and power and is duly authorized and empowered to enter into, execute, deliver and perform this Agreement and each of the other Loan Documents to which the Borrowers are a party and to consummate the transactions contemplated hereby and to perform its obligations hereunder. The execution, delivery and performance of this Agreement and each of the other Loan Documents to which the Borrowers are a party have been duly authorized by all necessary company, corporate or individual action, as the case may be, and do not and will not: (i) contravene the Borrowers' Articles of Incorporation or Organization, bylaws or members written declarations, or other organizational or governing document; (ii) violate, or cause the Borrowers to be in material default under, any provision of any law, rule, regulation, order, writ, judgment, injunction, decree, determination or award in effect having applicability to the Borrowers; (iii) result in a material breach of or constitute a material default under any indenture or loan or credit agreement or any other agreement, lease or instrument to which the Borrowers are a party or by which the Borrowers' property may be bound or affected; or (iv) result in, or require, the creation or imposition of any lien upon or with respect to the Premises or the Improvements;

(iii) This Agreement and each of the other Loan Documents to which the Borrowers are a party, have been duly and validly executed and delivered and are in all respects legal, valid, binding and enforceable against the Borrowers in accordance with their respective terms, except to the extent that such enforcement may be limited by applicable bankruptcy, insolvency and other similar laws affecting creditors' rights generally or by principles of equity pertaining to the availability of equitable remedies;

(iv) To the best of the Borrowers' actual knowledge and based on the fact that the Borrowers nor Guarantors have received any notice to the contrary, the Borrowers have, and are in good standing with respect to, all governmental consents, waivers, approvals, authorizations, permits, certificates, inspections and franchises necessary to continue to conduct their respective business as heretofore or proposed to be conducted by it and to own and operate the Premises and/or the Improvements as a sixty-four (64)-bed licensed nursing home facility;

(v) The Borrowers are not parties or subject to any contract, agreement, charter or other company/individual restriction, which materially adversely affects the Borrowers' business or the use or ownership of the Premises or the Improvements. The Borrowers are not parties or subject to any contract or agreement which restricts the Borrowers' right or ability to incur any indebtedness which would prohibit the execution of or compliance with this Agreement by the Borrowers. The Borrowers have not agreed or consented to cause or permit in the future (upon the happening of a contingency or otherwise) the Premises or the Improvements to be subject to a lien that is not permitted under this Agreement;

(vi) To the best of the Borrowers' actual knowledge and based on the provisions of the Leases, and on the fact that the Borrowers nor Guarantors have received any notice to the contrary, there are no actions, suits, proceedings or investigations pending, or to the knowledge of the Borrowers, threatened, against or affecting the Borrowers, the Premises, or the business, operations, properties, prospects, profits or condition of the Borrowers, in any court or before any governmental authority or arbitration board or tribunal. To the best of the Borrowers' actual knowledge and based on the fact that the Borrowers nor Guarantors have received any notice to the contrary, the Borrowers are not in default with respect to any order, writ, injunction, judgment, decree or rule of any court, governmental authority or arbitration board or tribunal;

(vii) The financial statements and information referred to in Paragraph 8 hereof, to the extent such financial statements and information are prepared by or on behalf of the Borrowers, to the best of the Borrowers' actual knowledge, do not, nor does this Agreement or any other written statement of the Borrowers to Lender, contain any untrue statement of a material fact or omit a material fact necessary to make the statements contained therein or herein not misleading. There is no fact which the Borrowers have failed to disclose to Lender in writing which materially adversely affects or, so far as the Borrowers can now reasonably foresee, will materially adversely affect the Premises, Facility Improvements, business, prospects, profits or condition (financial or otherwise) of the Borrowers or the ability of the Borrowers to perform this Agreement;

(viii) To the best of the Borrowers' actual knowledge and based on the provisions of the Leases, and on the fact that the Borrowers nor Guarantors have received any notice to the contrary, the Borrowers have duly complied with, and the Premises, Improvements and the Borrowers' property, business operations and leaseholds are in compliance in all material respects with, and will maintain compliance in all material respects with, the provisions of all federal, state and local laws, rules and regulations applicable to the Borrowers, its property or the conduct of the Borrowers' business, and there have been no citations, notices or orders of noncompliance issued to the Borrowers under any such law, rule or regulation;

(ix) The Borrowers shall use the proceeds from the Loan for the purpose of refinancing certain outstanding indebtedness of the Borrowers that is currently secured by first mortgages on the Premises, which mortgages and other related security shall be released in connection with the closing of the Loan;

(x) To the best of the Borrowers' actual knowledge and based on the fact that the Borrowers nor Guarantors have received any notice to the contrary, the Premises are validly zoned by the governmental authority having zoning jurisdiction over the Premises under the zoning classification which permits the use of the Premises as a sixty-four (64)-bed licensed nursing home facility.

(xi) The Borrowers will not encumber in any way (except for the liens of the Mortgages, the Permitted Encumbrances and the Leases), notwithstanding that any such lien or encumbrance is minor and subordinated to the liens of Lender, the Premises, the Facility, the Permits, the Improvements or the goods, materials, equipment, fixtures or any other personal property now existing on or used in or about the Premises, the Improvements or hereafter acquired for the installation or use in, on or about the Premises, or the Improvements;

(xii) To the best of the Borrowers' actual knowledge and based on the provisions of the Leases, and on the fact that the Borrowers nor Guarantors have received any notice to the contrary, all work in connection with construction of any improvements, maintenance or repairs with respect to the Premises shall be performed in compliance with all applicable laws, ordinances, rules and regulations of federal, state, county or municipal governments or agencies now in force or that may be enacted hereafter, and with all directions, rules and regulations of the fire marshal, health officer, building inspector or other proper officers of any governmental agency, including those of the Pennsylvania or Federal Environmental Protection Agency or the United States Army Corps of Engineers (as to wetlands development), now having or hereafter acquiring jurisdiction over the Premises;

(xiii) Water service, electric or gas service and telephone service are available to the Premises and are of sufficient capacity to serve the Premises as presently existing assuming same to be fully utilized. Sanitary sewer service is available to the Premises and is of an adequate size and capacity to serve the Premises as presently existing assuming same to be fully utilized;

10

(xiv)  The Borrowers have not employed or engaged any broker, finder or agent who may claim a commission or fee on the loan transaction described in this Agreement and the Borrowers hereby agree to indemnify and hold Lender harmless from any such claim or demand and litigation resulting therefrom;

(xv)  The location of the Borrowers' principal place of business and chief executive officer is as set forth in Paragraph 22 hereof;

(xvi)  No event has occurred and no condition exists which would, upon the execution and delivery of this Agreement or the Borrowers' performance hereunder, constitute an Event of Default as hereinafter described.  The Borrowers are not in default, and no event has occurred and no conditions exist which constitute, or which with the passage of time or the giving of notice or both would constitute, a default in the payment of any indebtedness of the Borrowers to any person for money borrowed;

(xvii)  The  Borrowers have good and marketable title in the items of property described herein as Collateral free and clear of any liens, encumbrances or adverse claims, whether legal or equitable, except Permitted Encumbrances and the Leases.  The Borrowers will keep, or pursuant to the Lease, cause Tenant to keep, the Collateral insured in such companies, in such amounts and against such risks as are acceptable to Lender, with satisfactory loss payable clauses in favor of Lender as mortgagee, and the Borrowers will deposit copies of the policies with Lender;

(xviii)  The Borrowers have filed all federal, state and local tax returns which are required to be filed and has paid, or made adequate provision for the payment of, all taxes which are shown pursuant to such returns or are required to be shown thereon or to assessments received by the Borrowers, including, without limitation, provider taxes and nursing home bed taxes.  All such returns are complete and accurate in all respects.  The Borrowers have paid or made adequate provision for the payment of or pursuant to the Lease, cause Tenant to pay or make adequate provision for the payment of all applicable water and sewer charges, ground rents (if applicable) and taxes.  All information furnished or to be furnished by the Borrowers to the Lender in connection with the Loan or any of the Loan Documents, to the extent such information is prepared by or on behalf of the Borrowers, is, or will be at the time the same is furnished, accurate and correct in all material respects and complete insofar as completeness may be necessary to provide the Lender with true and accurate knowledge of the subject matter;

(xix)  The Borrowers will not sell or offer to sell or otherwise transfer or encumber all or a part of the Collateral (except for the Leases) without written consent of Lender; the Borrowers will keep, or pursuant to the Leases, cause any tenant thereunder to keep, the Collateral in good order and repair and will not destroy the Collateral.  Lender, at its option, may discharge taxes, liens or other encumbrances placed on the Collateral and not timely paid or released, and may pay for the preservation of the Collateral if the Borrowers fail to do so.  The Borrowers agree to reimburse Lender, upon demand, for any such expenditure;

(xx)  The exact legal name of the Borrowers (including the name given in the Borrowers' organizational documents as applicable) is as set forth on Page 1 of this Agreement;

(xxi)  (i) The Borrowers shall, or pursuant to the Leases, cause any tenant thereunder to comply with all applicable requirements in order to keep, maintain and preserve unconditional certification of the Facility as a facility entitled to participate in the so-called Medicaid and Medicare programs as a sixty-four (64)-bed licensed nursing facility and entitled to receive payments therefrom, under the laws of the United States and Commonwealth of Pennsylvania and regulations and guidelines promulgated thereunder; (ii) the Borrowers shall or pursuant  to the Leases, cause any tenant thereunder to maintain, keep and preserve the Facility in such condition as to qualify for licensure to operate as a sixty-four (64)-bed licensed nursing home facility, and take all steps necessary to maintain such licensure under the laws of the United States and Commonwealth of Pennsylvania and regulations and guidelines promulgated thereunder; (iii) the Borrowers shall, or pursuant to the Leases, cause any tenant thereunder to, comply with all terms and conditions of any permits, licenses, certifications and certificates of need granted by the Pennsylvania Department of Health or of any notices of intent filed with the Pennsylvania Department of Health, ensure that any applicable licenses, provider agreements, permits, certifications and certificates of need remain in full force and effect and take all reasonable steps to ensure that no action or omission occurs which jeopardizes or would likely jeopardize the continuing existence or enforceability of any required permits, licenses or certifications, or the certificate of need program under Pennsylvania law; (iv) to the best of the

Borrowers' actual knowledge and based on the provisions of the Leases, and on the fact that the Borrowers nor Guarantors have received any notice to the contrary, there is no threatened or pending revocation, suspension, termination, probation, restriction, limitation, or nonrenewal affecting the Borrowers or the Facility or any participation in or under any Reimbursement Contracts; (v) to the best of the Borrowers' actual knowledge and based on the provisions of the Leases, and on the fact that the Borrowers nor Guarantors have received any notice to the contrary, all Medicare, Medicaid and private insurance cost reports and financial reports submitted by the Borrowers are and will be materially accurate and complete and have not been and will not be misleading in any material respects; (vi) to the best of the Borrowers' actual knowledge and based on the provisions of the Leases, and on the fact that the Borrowers nor Guarantors have received any notice to the contrary, no cost reports for the Facility remain "open" or unsettled except for those not yet finalized in the ordinary course, (vii) to the best of the Borrowers' actual knowledge and based on the provisions of the Leases, and on the fact that the Borrowers nor Guarantors have received any notice to the contrary, neither the Borrowers nor the Facility is currently the subject of any proceeding by and governmental agency, and no notice of any violation has been received from any federal, state or local government or quasi-governmental body or agency or any administrative or investigative body that would, directly or indirectly, or with the passage of time: (A) have a material adverse impact on Facility's ability to accept and/or retain residents or result in the imposition of a fine, a sanction, a lower rate certification or a lower reimbursement rate for services rendered to eligible residents; (B) modify, limit or annul or result in the transfer, suspension, revocation or imposition of probationary use of any of the Permits; or (C) affect Facility's continued participation in the Medicare or Medicaid programs or any other Reimbursement Contracts, or any successor programs or contracts thereto, at current rate certifications; (viii) to the best of the Borrowers' actual knowledge and based on the provisions of the Lease, and on the fact that the Borrowers nor Guarantors have received any notice to the contrary, the Facility and the use thereof comply in all material respects with all applicable local, state and federal building codes, fire codes, health care, nursing home, assisted living, residential care and senior housing facility (as applicable) and other similar regulatory requirements including, but not limited to, minimum square foot requirements per bed applicable to the Facility (the "Physical Plant Standards"), and no waivers of Physical Plant Standards exist at the Facility.

(xxii) To the best of the Borrowers' actual knowledge and based on the fact that the Borrowers nor Guarantors have received any notice to the contrary, the Facility is duly licensed as a sixty-four (64)-bed licensed nursing home facility under the applicable laws of the Commonwealth of Pennsylvania and the Facility is currently operated as a sixty-four (64)-bed skilled nursing home facility. To the best of the Borrowers' actual knowledge and based on the fact that the Borrowers nor Guarantors have received any notice to the contrary, the Borrowers or any tenant thereunder are the lawful owners of all Permits required to own and operate the Facility as aforesaid, including, without limitation, the certificate of need, rights to operate nursing home beds, operating rights, and licenses, as applicable, which (A) are in full force and effect, (B) constitute all of the permits, licenses and certificates required for the ownership, use, operation, management and occupancy thereof, (C) have not been pledged as collateral for any other loan or indebtedness, (D) are held free from any restriction or any encumbrance which would materially adversely affect the ownership, use, operation, management or occupancy of the Facility except for the Leases and (E) are not provisional, probationary or restricted in any way. To the best of the Borrowers' actual knowledge and based on the provisions of the Leases, and on the fact that the Borrowers nor Guarantors have received any notice to the contrary, the Borrowers' and any tenant thereunder, as appropriate, ownership, use, operation, management and occupancy of the Facility is in compliance in all material respects with the applicable provisions of all laws, rules, regulations and published interpretations to which the Facility is subject. To the best of the Borrowers' actual knowledge and based on the fact that the Borrowers nor Guarantors have received any notice to the contrary, no waivers of any laws, rules, regulations, or requirements (including, but not limited to, minimum square foot requirements per bed) are required for the Facility to operate at the foregoing licensed bed capacity. To the best of the Borrowers' actual knowledge and based on the provisions of the Leases, and on the fact that the Borrowers nor Guarantors have received any notice to the contrary, all Reimbursement Contracts are in full force and effect with respect to the Facility, and Facility is in good standing with all the respective agencies governing such applicable Facility licenses, Permits, program certifications and Reimbursement Contracts. To the best of the Borrowers' actual knowledge and based on the provisions of the Leases, and on the fact that the Borrowers nor Guarantors have received any notice to the contrary, Facility is current in the payment of all so-called provider specific taxes or other assessments with respect to such Reimbursement Contracts. To the best of the Borrowers' actual knowledge and based on the fact that the Borrowers nor Guarantors have received any notice to the contrary, the Borrowers are current in the payment of all bed taxes imposed with respect to the Facility. The Borrowers shall, or pursuant to the Leases, cause any tenant thereunder to, as applicable, maintain the Certificate of Need and/or any required Permits in full force and effect and as a sixty-four (64)-bed licensed nursing home facility. In the event Lender acquires the Facility through foreclosure or otherwise, without taking into account any changes in current law applicable to the Facility, neither Lender nor a subsequent manager, a subsequent lessee

or any subsequent purchaser (through foreclosure or otherwise) must obtain a certificate of need prior to applying for and receiving a license to operate the Facility and certification to receive Medicare and Medicaid payments (and its successor programs) for residents having coverage thereunder provided that no service or bed complement is changed or relocated. The Borrowers shall not, and the Borrowers have not granted to any third party the right to, reduce the number of licensed or unlicensed beds in the Facility or to apply for approval to transfer the right to any or all of the licensed or unlicensed Facility beds to any other location. To the best of the Borrowers' actual knowledge and based on the fact that the Borrowers nor Guarantor have received any notice to the contrary, the Facility is in compliance with all requirements for participation in Medicare and Medicaid, including without limitation, the Medicare and Medicaid Patient Protection Act of 1987. To the best of the Borrowers' actual knowledge and based on the fact that the Borrowers nor Guarantors have received any notice to the contrary, the Facility is in conformance in all material respects with all insurance, reimbursement and cost reporting requirements and has a current provider agreement which is in full force and effect under Medicare and Medicaid.

(xxiii) That (i) neither the Borrowers nor any agent of the Borrowers has offered or given any remuneration or thing of value to any person to encourage referral to the Facility nor have the Borrowers or any of the Borrowers' agents solicited or received any remuneration or thing of value in exchange for the Borrowers' agreement to make referrals or to purchase goods or services for the Facility; (ii) no physician or other healthcare practitioner has an ownership interest in, or financial relationship (in violation of any applicable law) with, the Borrowers or the Facility; (iii) all cost report periods for all Facility payors have been closed and settled, and all required adjustments have been fully paid and/or implemented, except those not yet finalized in the ordinary course.

The Borrowers covenant, warrant and represent to Lender that all representations and warranties of the Borrowers contained in this Agreement or any of the other Loan Documents shall be true at the time of the Borrowers' execution of this Agreement and the other Loan Documents, and shall survive the execution, delivery and acceptance thereof by Lender and the parties thereof and the closing of the transactions described therein or related thereto.

(b) Care First hereby represents, warrants and covenants to Bank as follows:

(i)  Care First is a Pennsylvania limited liability company organized, validly existing and in good standing under the laws of the State of Pennsylvania, and Care First is duly qualified and authorized to do business in and is in good standing in all other states and jurisdictions where the character of its property or the nature of its activities make such qualification necessary;

(ii)  Care First has the right and power and is duly authorized and empowered to enter into, execute, deliver and perform this Agreement and each of the other Loan Documents to which it is a party, consummate the transactions contemplated herein or therein and perform its obligations hereunder.  The execution, delivery and performance of this Agreement and each of the other Loan Documents to which a Care First is a party have been duly authorized by all necessary company, corporate or individual action, as the case may be, and do not and will not: (i) violate Care First's Articles of Organization, Written Members Declaration, Operating Agreement, or other organizational or governing document; (ii) violate, or cause Care First to be in default under, any provision of any law, rule, regulation, order, writ, judgment, injunction, decree, determination or award in effect having applicability to Care First; or (iii) result in a breach of or constitute a default under any indenture or loan or credit agreement or any other agreement, lease or instrument to which the Borrowers are a party or by which Care First's property may be bound or affected;

(iii)  This Agreement and each of the other Loan Documents to which Care First is a party, have been duly and validly executed and delivered and are in all respects legal, valid, binding and enforceable against Care First and the Guarantors in accordance with their respective terms, except to the extent that such enforcement may be limited by applicable bankruptcy, insolvency and other similar laws affecting creditors' rights generally or by principles of equity pertaining to the availability of equitable remedies;

(iv)  Care First is in good standing with respect to, all governmental consents, waivers, approvals, authorizations, permits, certificates, inspections and franchises necessary to continue to conduct its business;

(v)  Care First is not a party or subject to any contract or agreement which restricts Care First's right or ability to incur any indebtedness or which would prohibit its execution of or compliance with this Agreement;

(vi)  There are no actions, suits, proceedings or investigations pending, or to the knowledge of Care First, threatened, against or affecting Care First, the result of which is likely to materially adversely affect Care First or its business, operations, properties, prospects, profits or condition, in any court or before any governmental authority or arbitration board or tribunal. Care First is not in default with respect to any order, writ, injunction, judgment, decree or rule of any court, governmental authority or arbitration board or tribunal;

(vii)  The financial statements and information referred to in this Agreement do not, nor does this Agreement or any other written statement of Care First to Bank, contain any untrue statement of a material fact or omit a material fact necessary to make the statements contained therein or herein not misleading.  There is no fact which Care First has failed to disclose to Bank in writing which materially adversely affects or, so far as Care First can now reasonably foresee, will materially adversely affect the prospects, profits or condition (financial or otherwise) of Care First or the ability of Care First to perform this Agreement;

(viii)  Care First's property and business operations are in compliance in all material respects with, and will maintain compliance in all material respects with, the provisions of all federal, state and local laws, rules and regulations applicable to Care First, its property, or the conduct of Care First's business, and there has been no citations, notices or orders of noncompliance issued to Care First under any such law, rule or regulation;

(ix)  Care First has not employed or engaged any broker, finder or agent who may claim a commission or fee on the loan transaction described in this Agreement that has not been fully disclosed to Bank by Care First, and Care First hereby agrees to indemnify and hold Bank harmless from any such claim or demand and litigation resulting therefrom;

(x)  The location of Care First's principal place of business is as set forth in Paragraph 22 hereof;

(xi) No event has occurred and no condition exists which would, upon the execution and delivery of this Agreement or Care First's performance hereunder, constitute an Event of Default as hereinafter described. Care First is not in default, and no event has occurred and no conditions exist which constitute, or which with the passage of time or the giving of notice or both would constitute, a default in the payment of any indebtedness of any Care First to any person for money borrowed;

(xii) Care First has filed all federal, state and local tax returns which are required to be filed and has paid, or made adequate provision for the payment of, all taxes which are shown pursuant to such returns or are required to be shown thereon or to assessments received by Care First. All such returns are complete and accurate in all respects. All information furnished or to be furnished by Care First to the Bank in connection with the Loans or any of the Loan Documents, is, or will be at the time the same is furnished, accurate and correct in all material respects and complete insofar as completeness may be necessary to provide the Bank with true and accurate knowledge of the subject matter.

(c)     Cauterucci hereby represents, warrants and covenants to Bank as follows:

(i) Cauterucci is a natural person who has the right and power to execute, deliver and perform this Agreement and each of the other Loan Documents to which he is a party, consummate the transactions contemplated herein or therein and perform its obligations hereunder;

(ii) This Agreement and each of the other Loan Documents to which Cauterucci is a party, have been duly and validly executed and delivered by Cauterucci and are in all respects legal, valid, binding and enforceable against him in accordance with their respective terms, except to the extent that such enforcement may be limited by applicable bankruptcy, insolvency and other similar laws affecting creditors' rights generally or by principles of equity pertaining to the availability of equitable remedies;

(iii) Cauterucci is not a party or subject to any contract or agreement which restricts his right or ability to incur any indebtedness or which would prohibit his execution of or compliance with this Agreement; .

(iv) There are no actions, suits, proceedings or investigations pending, or to the knowledge of Cauterucci, threatened, against or affecting Cauterucci that will materially adversely affect Cauterucci's ability to perform any Obligation, in any court or before any governmental authority or arbitration board or tribunal. Cauterucci is not in default with respect to any order, writ, injunction, judgment, decree or rule of any court, governmental authority or arbitration board or tribunal;

(v) The financial statements and information referred to in this Agreement do not, nor does this Agreement or any other written statement of Cauterucci to Bank, contain any untrue statement of a material fact or omit a material fact necessary to make the statements contained therein or herein not misleading. There is no fact which Cauterucci has failed to disclose to Bank in writing which materially adversely affects or, so far as Cauterucci can now reasonably foresee, will materially adversely affect the prospects, profits or condition (financial or otherwise) of Cauterucci or his ability to perform this Agreement;

(vi) No event has occurred and no condition exists which would, upon the execution and delivery of this Agreement or Cauterucci's performance hereunder, constitute an Event of Default as hereinafter described. Cauterucci is not in default, and no event has occurred and no conditions exist which constitute, or which with the passage of time or the giving of notice or both would constitute, a default in the payment of any indebtedness of Cauterucci to any person for money borrowed;

(vii) Cauterucci has filed all federal, state, and local tax returns which are required to be filed and has paid, or made adequate provision for the payment of, all taxes which are shown pursuant to such returns or are required to be shown thereon or to assessments received by Cauterucci. All such returns are complete and accurate in all respects. All information furnished or to be furnished by Cauterucci to the Bank in connection with the Loans or any of the Loan Documents, is, or will be at the time the same is furnished, accurate and correct in all material respects and complete insofar as completeness may be necessary to provide the Bank with true and accurate knowledge of the subject matter;

(viii) The exact legal name of Cauterucci is as set forth on Page 1 of this Agreement.

15

(d)     Krause hereby represents, warrants and covenants to Bank as follows:

(i) Krause is a natural person who has the right and power to execute, deliver and perform this Agreement and each of the other Loan Documents to which he is a party, consummate the transactions contemplated herein or therein and perform its obligations hereunder;

(ii) This Agreement and each of the other Loan Documents to which Krause is a party, have been duly and validly executed and delivered by Krause and are in all respects legal, valid, binding and enforceable against him in accordance with their respective terms, except to the extent that such enforcement may be limited by applicable bankruptcy, insolvency and other similar laws affecting creditors' rights generally or by principles of equity pertaining to the availability of equitable remedies;

(iii) Krause is not a party or subject to any contract or agreement which restricts his right or ability to incur any indebtedness or which would prohibit his execution of or compliance with this Agreement;

(iv) There are no actions, suits, proceedings or investigations pending, or to the knowledge of Krause, threatened, against or affecting Krause that will materially adversely affect Krause's ability to perform any Obligation, in any court or before any governmental authority or arbitration board or tribunal. Krause is not in default with respect to any order, writ, injunction, judgment, decree or rule of any court, governmental authority or arbitration board or tribunal;

(v) The financial statements and information referred to in this Agreement do not, nor does this Agreement or any other written statement of Krause to Bank, contain any untrue statement of a material fact or omit a material fact necessary to make the statements contained therein or herein not misleading. There is no fact which Krause has failed to disclose to Bank in writing which materially adversely affects or, so far as Krause can now reasonably foresee, will materially adversely affect the prospects, profits or condition (financial or otherwise) of Krause or his ability to perform this Agreement;

(vi) No event has occurred and no condition exists which would, upon the execution and delivery of this Agreement or Krause's performance hereunder, constitute an Event of Default as hereinafter described. Krause is not in default, and no event has occurred and no conditions exist which constitute, or which with the passage of time or the giving of notice or both would constitute, a default in the payment of any indebtedness of Krause to any person for money borrowed;

(vii) Krause has filed all federal, state, and local tax returns which are required to be filed and has paid, or made adequate provision for the payment of, all taxes which are shown pursuant to such returns or are required to be shown thereon or to assessments received by Krause. All such returns are complete and accurate in all respects. All information furnished or to be furnished by Krause to the Bank in connection with the Loans or any of the Loan Documents, is, or will be at the time the same is furnished, accurate and correct in all material respects and complete insofar as completeness may be necessary to provide the Bank with true and accurate knowledge of the subject matter;

(viii) The exact legal name of Krause is as set forth on Page 1 of this Agreement.

(e)     Nealon hereby represents, warrants and covenants to Bank as follows:

(i) Nealon is a natural person who has the right and power to execute, deliver and perform this Agreement and each of the other Loan Documents to which he is a party, consummate the transactions contemplated herein or therein and perform its obligations hereunder;

(ii) This Agreement and each of the other Loan Documents to which Nealon is a party, have been duly and validly executed and delivered by Nealon and are in all respects legal, valid, binding and enforceable against him in accordance with their respective terms, except to the extent that such enforcement may be limited by applicable bankruptcy, insolvency and other similar laws affecting creditors' rights generally or by principles of equity pertaining to the availability of equitable remedies;

16

(iii) Nealon is not a party or subject to any contract or agreement which restricts his right or ability to incur any indebtedness or which would prohibit his execution of or compliance with this Agreement;

(iv) There are no actions, suits, proceedings or investigations pending, or to the knowledge of Nealon, threatened, against or affecting Nealon that will materially adversely affect Nealon's ability to perform any Obligation, in any court or before any governmental authority or arbitration board or tribunal. Nealon is not in default with respect to any order, writ, injunction, judgment, decree or rule of any court, governmental authority or arbitration board or tribunal;

(v) The financial statements and information referred to in this Agreement do not, nor does this Agreement or any other written statement of Nealon to Bank, contain any untrue statement of a material fact or omit a material fact necessary to make the statements contained therein or herein not misleading. There is no fact which Nealon has failed to disclose to Bank in writing which materially adversely affects or, so far as Nealon can now reasonably foresee, will materially adversely affect the prospects, profits or condition (financial or otherwise) of Nealon or his ability to perform this Agreement;

(vi) No event has occurred and no condition exists which would, upon the execution and delivery of this Agreement or Nealon's performance hereunder, constitute an Event of Default as hereinafter described. Nealon is not in default, and no event has occurred and no conditions exist which constitute, or which with the passage of time or the giving of notice or both would constitute, a default in the payment of any indebtedness of Nealon to any person for money borrowed;

(vii) Nealon has filed all federal, state, and local tax returns which are required to be filed and has paid, or made adequate provision for the payment of, all taxes which are shown pursuant to such returns or are required to be shown thereon or to assessments received by Nealon. All such returns are complete and accurate in all respects. All information furnished or to be furnished by Nealon to the Bank in connection with the Loans or any of the Loan Documents, is, or will be at the time the same is furnished, accurate and correct in all material respects and complete insofar as completeness may be necessary to provide the Bank with true and accurate knowledge of the subject matter;

(viii) The exact legal name of Nealon is as set forth on Page 1 of this Agreement.

(f)     Bierman hereby represents, warrants and covenants to Bank as follows:

(i) Bierman is a natural person who has the right and power to execute, deliver and perform this Agreement and each of the other Loan Documents to which he is a party, consummate the transactions contemplated herein or therein and perform its obligations hereunder;

(ii) This Agreement and each of the other Loan Documents to which Bierman is a party, have been duly and validly executed and delivered by Bierman and are in all respects legal, valid, binding and enforceable against him in accordance with their respective terms, except to the extent that such enforcement may be limited by applicable bankruptcy, insolvency and other similar laws affecting creditors' rights generally or by principles of equity pertaining to the availability of equitable remedies;

(iii) Bierman is not a party or subject to any contract or agreement which restricts his right or ability to incur any indebtedness or which would prohibit his execution of or compliance with this Agreement;

(iv) There are no actions, suits, proceedings or investigations pending, or to the knowledge of Bierman, threatened, against or affecting Bierman that will materially adversely affect Bierman's ability to perform any Obligation, in any court or before any governmental authority or arbitration board or tribunal. Bierman is not in default with respect to any order, writ, injunction, judgment, decree or rule of any court, governmental authority or arbitration board or tribunal;

(v) The financial statements and information referred to in this Agreement do not, nor does this Agreement or any other written statement of Bierman to Bank, contain any untrue statement of a material fact or omit a material fact necessary to make the statements contained therein or herein not misleading. There is no fact which Bierman has failed to disclose to Bank in writing which materially adversely affects or, so far as Bierman can now reasonably

foresee, will materially adversely affect the prospects, profits or condition (financial or otherwise) of Bierman or his ability to perform this Agreement;

(vi) No event has occurred and no condition exists which would, upon the execution and delivery of this Agreement or Bierman's performance hereunder, constitute an Event of Default as hereinafter described. Bierman is not in default, and no event has occurred and no conditions exist which constitute, or which with the passage of time or the giving of notice or both would constitute, a default in the payment of any indebtedness of Bierman to any person for money borrowed;

(vii) Bierman has filed all federal, state, and local tax returns which are required to be filed and has paid, or made adequate provision for the payment of, all taxes which are shown pursuant to such returns or are required to be shown thereon or to assessments received by Bierman. All such returns are complete and accurate in all respects. All information furnished or to be furnished by Bierman to the Bank in connection with the Loans or any of the Loan Documents, is, or will be at the time the same is furnished, accurate and correct in all material respects and complete insofar as completeness may be necessary to provide the Bank with true and accurate knowledge of the subject matter;

(viii) The exact legal name of Bierman is as set forth on Page 1 of this Agreement.

(g)     Leone hereby represents, warrants and covenants to Bank as follows:

(i) Leone is a natural person who has the right and power to execute, deliver and perform this Agreement and each of the other Loan Documents to which he is a party, consummate the transactions contemplated herein or therein and perform its obligations hereunder;

(ii) This Agreement and each of the other Loan Documents to which Leone is a party, have been duly and validly executed and delivered by Leone and are in all respects legal, valid, binding and enforceable against him in accordance with their respective terms, except to the extent that such enforcement may be limited by applicable bankruptcy, insolvency and other similar laws affecting creditors' rights generally or by principles of equity pertaining to the availability of equitable remedies;

(iii) Leone is not a party or subject to any contract or agreement which restricts his right or ability to incur any indebtedness or which would prohibit his execution of or compliance with this Agreement;

(iv) There are no actions, suits, proceedings or investigations pending, or to the knowledge of Leone, threatened, against or affecting Leone that will materially adversely affect Leone's ability to perform any Obligation, in any court or before any governmental authority or arbitration board or tribunal. Leone is not in default with respect to any order, writ, injunction, judgment, decree or rule of any court, governmental authority or arbitration board or tribunal;

(v) The financial statements and information referred to in this Agreement do not, nor does this Agreement or any other written statement of Leone to Bank, contain any untrue statement of a material fact or omit a material fact necessary to make the statements contained therein or herein not misleading. There is no fact which Leone has failed to disclose to Bank in writing which materially adversely affects or, so far as Leone can now reasonably foresee, will materially adversely affect the prospects, profits or condition (financial or otherwise) of Leone or his ability to perform this Agreement;

(vi) No event has occurred and no condition exists which would, upon the execution and delivery of this Agreement or Leone's performance hereunder, constitute an Event of Default as hereinafter described. Leone is not in default, and no event has occurred and no conditions exist which constitute, or which with the passage of time or the giving of notice or both would constitute, a default in the payment of any indebtedness of Leone to any person for money borrowed;

(vii) Leone has filed all federal, state, and local tax returns which are required to be filed and has paid, or made adequate provision for the payment of, all taxes which are shown pursuant to such returns or are required to be shown thereon or to assessments received by Leone. All such returns are complete and accurate in all respects. All information furnished or to be furnished by Leone to the Bank in connection with the Loans or any of the Loan Documents,

Case 1:10-bk-05235-MDF    Doc 45-2    Filed 07/09/10    Entered 07/09/10 14:36:59    Desc
Exhibit B    Page 18 of 51

is, or will be at the time the same is furnished, accurate and correct in all material respects and complete insofar as completeness may be necessary to provide the Bank with true and accurate knowledge of the subject matter;

(viii) The exact legal name of Leone is as set forth on Page 1 of this Agreement.

(h)     Mehta hereby represents, warrants and covenants to Bank as follows:

(i) Mehta is a natural person who has the right and power to execute, deliver and perform this Agreement and each of the other Loan Documents to which he is a party, consummate the transactions contemplated herein or therein and perform its obligations hereunder;

(ii) This Agreement and each of the other Loan Documents to which Mehta is a party, have been duly and validly executed and delivered by Mehta and are in all respects legal, valid, binding and enforceable against him in accordance with their respective terms, except to the extent that such enforcement may be limited by applicable bankruptcy, insolvency and other similar laws affecting creditors' rights generally or by principles of equity pertaining to the availability of equitable remedies;

(iii) Mehta is not a party or subject to any contract or agreement which restricts his right or ability to incur any indebtedness or which would prohibit his execution of or compliance with this Agreement;

(iv) There are no actions, suits, proceedings or investigations pending, or to the knowledge of Mehta, threatened, against or affecting Mehta that will materially adversely affect Mehta's ability to perform any Obligation, in any court or before any governmental authority or arbitration board or tribunal. Mehta is not in default with respect to any order, writ, injunction, judgment, decree or rule of any court, governmental authority or arbitration board or tribunal;

(v) The financial statements and information referred to in this Agreement do not, nor does this Agreement or any other written statement of Mehta to Bank, contain any untrue statement of a material fact or omit a material fact necessary to make the statements contained therein or herein not misleading. There is no fact which Mehta has failed to disclose to Bank in writing which materially adversely affects or, so far as Mehta can now reasonably foresee, will materially adversely affect the prospects, profits or condition (financial or otherwise) of Mehta or his ability to perform this Agreement;

(vi) No event has occurred and no condition exists which would, upon the execution and delivery of this Agreement or Mehta's performance hereunder, constitute an Event of Default as hereinafter described. Mehta is not in default, and no event has occurred and no conditions exist which constitute, or which with the passage of time or the giving of notice or both would constitute, a default in the payment of any indebtedness of Mehta to any person for money borrowed;

(vii) Mehta has filed all federal, state, and local tax returns which are required to be filed and has paid, or made adequate provision for the payment of, all taxes which are shown pursuant to such returns or are required to be shown thereon or to assessments received by Mehta. All such returns are complete and accurate in all respects. All information furnished or to be furnished by Mehta to the Bank in connection with the Loans or any of the Loan Documents, is, or will be at the time the same is furnished, accurate and correct in all material respects and complete insofar as completeness may be necessary to provide the Bank with true and accurate knowledge of the subject matter;

(viii) The exact legal name of Mehta is as set forth on Page 1 of this Agreement.

(i)     Kim hereby represents, warrants and covenants to Bank as follows:

(i) Kim is a natural person who has the right and power to execute, deliver and perform this Agreement and each of the other Loan Documents to which he is a party, consummate the transactions contemplated herein or therein and perform its obligations hereunder;

(ii) This Agreement and each of the other Loan Documents to which Kim is a party, have been duly and validly executed and delivered by Kim and are in all respects legal, valid, binding and enforceable against him in

Case 1:10-bk-05235-MDF    Doc 45-2    Filed 07/09/10    Entered 07/09/10 14:36:59    Desc
Exhibit B    Page 19 of 51

accordance with their respective terms, except to the extent that such enforcement may be limited by applicable bankruptcy, insolvency and other similar laws affecting creditors' rights generally or by principles of equity pertaining to the availability of equitable remedies;

(iii) Kim is not a party or subject to any contract or agreement which restricts his right or ability to incur any indebtedness or which would prohibit his execution of or compliance with this Agreement;

(iv) There are no actions, suits, proceedings or investigations pending, or to the knowledge of Kim, threatened, against or affecting Kim that will materially adversely affect Kim's ability to perform any Obligation, in any court or before any governmental authority or arbitration board or tribunal. Kim is not in default with respect to any order, writ, injunction, judgment, decree or rule of any court, governmental authority or arbitration board or tribunal;

(v) The financial statements and information referred to in this Agreement do not, nor does this Agreement or any other written statement of Kim to Bank, contain any untrue statement of a material fact or omit a material fact necessary to make the statements contained therein or herein not misleading. There is no fact which Kim has failed to disclose to Bank in writing which materially adversely affects or, so far as Kim can now reasonably foresee, will materially adversely affect the prospects, profits or condition (financial or otherwise) of Kim or his ability to perform this Agreement;

(vi) No event has occurred and no condition exists which would, upon the execution and delivery of this Agreement or Kim's performance hereunder, constitute an Event of Default as hereinafter described. Kim is not in default, and no event has occurred and no conditions exist which constitute, or which with the passage of time or the giving of notice or both would constitute, a default in the payment of any indebtedness of Kim to any person for money borrowed;

(vii) Kim has filed all federal, state, and local tax returns which are required to be filed and has paid, or made adequate provision for the payment of, all taxes which are shown pursuant to such returns or are required to be shown thereon or to assessments received by Kim. All such returns are complete and accurate in all respects. All information furnished or to be furnished by Kim to the Bank in connection with the Loans or any of the Loan Documents, is, or will be at the time the same is furnished, accurate and correct in all material respects and complete insofar as completeness may be necessary to provide the Bank with true and accurate knowledge of the subject matter;

(viii) The exact legal name of Kim is as set forth on Page 1 of this Agreement.

(j)     Capozzi hereby represents, warrants and covenants to Bank as follows:

(i) Capozzi is a natural person who has the right and power to execute, deliver and perform this Agreement and each of the other Loan Documents to which he is a party, consummate the transactions contemplated herein or therein and perform its obligations hereunder;

(ii) This Agreement and each of the other Loan Documents to which Capozzi is a party, have been duly and validly executed and delivered by Capozzi and are in all respects legal, valid, binding and enforceable against him in accordance with their respective terms, except to the extent that such enforcement may be limited by applicable bankruptcy, insolvency and other similar laws affecting creditors' rights generally or by principles of equity pertaining to the availability of equitable remedies;

(iii) Capozzi is not a party or subject to any contract or agreement which restricts his right or ability to incur any indebtedness or which would prohibit his execution of or compliance with this Agreement;

(iv) There are no actions, suits, proceedings or investigations pending, or to the knowledge of Capozzi, threatened, against or affecting Capozzi that will materially adversely affect Capozzi's ability to perform any Obligation, in any court or before any governmental authority or arbitration board or tribunal. Capozzi is not in default with respect to any order, writ, injunction, judgment, decree or rule of any court, governmental authority or arbitration board or tribunal;

(v) The financial statements and information referred to in this Agreement do not, nor does this Agreement or any other written statement of Capozzi to Bank, contain any untrue statement of a material fact or omit a

material fact necessary to make the statements contained therein or herein not misleading. There is no fact which Capozzi has failed to disclose to Bank in writing which materially adversely affects or, so far as Capozzi can now reasonably foresee, will materially adversely affect the prospects, profits or condition (financial or otherwise) of Capozzi or his ability to perform this Agreement;

        (vi) No event has occurred and no condition exists which would, upon the execution and delivery of this Agreement or Capozzi's performance hereunder, constitute an Event of Default as hereinafter described. Capozzi is not in default, and no event has occurred and no conditions exist which constitute, or which with the passage of time or the giving of notice or both would constitute, a default in the payment of any indebtedness of Capozzi to any person for money borrowed;

        (vii) Capozzi has filed all federal, state, and local tax returns which are required to be filed and has paid, or made adequate provision for the payment of, all taxes which are shown pursuant to such returns or are required to be shown thereon or to assessments received by Capozzi. All such returns are complete and accurate in all respects. All information furnished or to be furnished by Capozzi to the Bank in connection with the Loans or any of the Loan Documents, is, or will be at the time the same is furnished, accurate and correct in all material respects and complete insofar as completeness may be necessary to provide the Bank with true and accurate knowledge of the subject matter;

        (viii)    The exact legal name of Capozzi is as set forth on Page 1 of this Agreement.

        (j)       Fisher hereby represents, warrants and covenants to Bank as follows:

        (i) Fisher is a natural person who has the right and power to execute, deliver and perform this Agreement and each of the other Loan Documents to which he is a party, consummate the transactions contemplated herein or therein and perform its obligations hereunder;

        (ii) This Agreement and each of the other Loan Documents to which Fisher is a party, have been duly and validly executed and delivered by Fisher and are in all respects legal, valid, binding and enforceable against him in accordance with their respective terms, except to the extent that such enforcement may be limited by applicable bankruptcy, insolvency and other similar laws affecting creditors' rights generally or by principles of equity pertaining to the availability of equitable remedies;

        (iii) Fisher is not a party or subject to any contract or agreement which restricts his right or ability to incur any indebtedness or which would prohibit his execution of or compliance with this Agreement;

        (iv) There are no actions, suits, proceedings or investigations pending, or to the knowledge of Fisher, threatened, against or affecting Fisher that will materially adversely affect Fisher's ability to perform any Obligation, in any court or before any governmental authority or arbitration board or tribunal. Fisher is not in default with respect to any order, writ, injunction, judgment, decree or rule of any court, governmental authority or arbitration board or tribunal;

        (v) The financial statements and information referred to in this Agreement do not, nor does this Agreement or any other written statement of Fisher to Bank, contain any untrue statement of a material fact or omit a material fact necessary to make the statements contained therein or herein not misleading. There is no fact which Fisher has failed to disclose to Bank in writing which materially adversely affects or, so far as Fisher can now reasonably foresee, will materially adversely affect the prospects, profits or condition (financial or otherwise) of Fisher or his ability to perform this Agreement;

        (vi) No event has occurred and no condition exists which would, upon the execution and delivery of this Agreement or Fisher's performance hereunder, constitute an Event of Default as hereinafter described. Fisher is not in default, and no event has occurred and no conditions exist which constitute, or which with the passage of time or the giving of notice or both would constitute, a default in the payment of any indebtedness of Fisher to any person for money borrowed;

        (vii) Fisher has filed all federal, state, and local tax returns which are required to be filed and has paid, or made adequate provision for the payment of, all taxes which are shown pursuant to such returns or are required to be

shown thereon or to assessments received by Fisher. All such returns are complete and accurate in all respects. All information furnished or to be furnished by Fisher to the Bank in connection with the Loans or any of the Loan Documents, is, or will be at the time the same is furnished, accurate and correct in all material respects and complete insofar as completeness may be necessary to provide the Bank with true and accurate knowledge of the subject matter;

       (viii)    The exact legal name of Fisher is as set forth on Page 1 of this Agreement.

    **12.**    **Borrowers' Existence and Authority; Opinion of Counsel; Other Documents.** At or prior to closing, the Borrowers and Guarantors shall furnish or cause to be furnished to Lender the following documents, as applicable to them, which shall be in form and substance reasonably satisfactory to Lender and Lender's counsel:

    (a)    With respect to the Borrowers:

    (i) True, correct and complete copies of the Articles of Incorporation and/or Articles or Organization certified by an officer of the Borrowers;

    (ii) True, correct and complete copies of all governing documents of the Borrowers including, but not limited to, the Bylaws and all amendments thereto, certified by an officer of the Borrowers;

    (iii) True, correct and complete copy of the resolutions of all of the directors of the Borrowers confirming the authorization, the execution, delivery and consummation of the transactions contemplated by this Agreement and all other documents or instruments to be executed and delivered in conjunction herewith and therewith;

    (iv) Closing Certificates certified by an officer of the Borrowers;

    (v) Full Force and Effect Certificates for the Borrowers, issued by the Pennsylvania Secretary of State or other appropriate official of the Borrowers' jurisdiction of organization and each jurisdiction where the conduct of the Borrowers' business activities or the ownership of its property necessitates qualification;

    (vi) A favorable opinion from the Borrowers' legal counsel dated as of the date of this Agreement, addressed to Lender in form, scope and substance satisfactory to Lender and its counsel, concerning such aspects of the Borrowers, the Loan and the Loan Documents as Lender and its counsel may require; and

    (vii) Such other documents, instruments, certificates, agreements or information of the Borrowers as Lender shall request, in Lender's reasonable discretion, in connection with the matters and transactions contemplated by this Agreement and the other Loan Documents.

    (b)    With respect to each Guarantor: Such other documents, instruments, certificates, agreements or information as Bank shall request, in Bank's reasonable discretion, in connection with the matters and transactions contemplated by this Agreement and the other Loan Documents.

    **13.**    **Conditions Precedent to Loan.** The Borrowers shall furnish to Lender all instruments and documents required to be furnished by the Borrowers to Lender at or prior to closing according to the provisions of this Agreement, all of which shall be duly executed and delivered, and in a form reasonably satisfactory to Lender and its legal counsel. Additionally, the Borrowers shall submit to Lender, or to such other Person specifically provided herein, at closing and prior to the disbursement of the Loan, the following which shall be in form and substance reasonably satisfactory to Lender and its counsel:

    (a)    Loan Policy. A paid ALTA Loan Title Policy consistent with the title commitment referred to in Paragraph 6 hereof.

    (b)    Survey. The survey of the Premises referred to in Paragraph 9 hereof, in form and substance, and by a firm or individual, satisfactory to Lender and at the Borrowers' cost.

(c)     <u>Lease</u>. A fully-executed copy of the Leases.

(d)     <u>Certified Governing Instruments</u>. The documents required by Paragraph 12 hereof.

(e)     <u>Utilities and Zoning</u>. Evidence reasonably satisfactory to Lender (i) of the availability of water, sanitary sewer, storm sewer, electric, gas and telephone service for the Premises, and (ii) that the Premises are validly zoned for its existing use as a sixty-four (64)-bed licensed nursing home facility.

(f)     <u>Liability, Hazard and Professional Liability Insurance</u>. Evidence of the insurance required pursuant to Paragraph 14(k) hereof.

(g)     <u>Lien Waivers</u>. Such lien waivers, affidavits, evidence of payment and the like, which may be requested by the Title Insurer as a condition to issuance of the title insurance required in accordance with Paragraph 6 of this Agreement or as otherwise required by Lender in its sole discretion.

(h)     <u>Appraisal</u>. A narrative appraisal of the Premises, in form, substance and amount, and by an appraiser, satisfactory to Lender, in Lender's sole and absolute discretion, and at the Borrowers' cost.

(i)     <u>Environmental Report</u>. A Walk-Over Environmental Questionnaire utilizing Lender's standard form of same.

(j)     <u>Fees and Expenses</u>. The Borrowers shall have paid the Loan Fees and all those fees, costs, expenses and charges then due and payable pursuant to this Agreement or the other Loan Documents.

(k)     <u>Notes, Mortgages and Other Loan Documents</u>. The Notes, Mortgages, Assignments of Licenses, Environmental Agreement and the other Loan Documents shall have been authorized, executed and delivered to Lender and all of the foregoing shall be valid, binding and enforceable in accordance with their respective terms and this Agreement.

(l)     <u>Non-Flood Prone Area</u>. Evidence reasonably satisfactory to Lender that the Premises are not located in a flood-prone area as defined by the U.S. Department of Housing and Urban Development in The Flood Disaster Protection Act of 1973, except as set forth on the survey and approved by Lender, and in such event, appropriate flood insurance is obtained by the Borrowers as reasonably required by Lender. In addition, Lender shall have received an acceptable current flood zone certification performed by an outside vendor separate from the surveyor.

(m)     <u>Subordinations</u>. All rights and claims (collectively, the "Claims") of any director or shareholder of the Borrowers' who is an individual, and/or any Affiliate of the Borrowers (collectively the "Claimants") against the Borrowers or any interest of the Borrowers affecting the Premises, which is now existing or hereafter arising, whether by subrogation, contribution or otherwise, shall be subordinate and subject in right of payment to the prior payment by the Borrowers of the Obligations to Lender. Until the Obligations to Lender have been paid in full and the Borrowers have performed all of its obligations hereunder, the Borrowers shall not, directly or indirectly, make any payment upon a Claim.

(n)     <u>Occupancy Permit, etc</u>. A copy of all applicable building and other governmental permits and evidence of compliance with all governmental or quasi-governmental laws, regulations and requirements with respect to the Improvements and/or the Premises, as reasonably requested by Lender, including but not limited to an occupancy permit.

(o)     <u>Other Documents</u>. Such other documents, instruments, certificates, agreements or information required pursuant to this Agreement, any loan commitment issued by Lender with respect to the Loan, or as Lender shall reasonably require in connection with the matters and transactions

contemplated by this Agreement and the other Loan Documents, including, but not limited to, the Environmental Agreement, the Lease Subordination and the Guaranties.

(p)     No Event of Default. As of the date of the disbursement of the Loan, the warranties and representations of the Borrowers contained in this Agreement or any other Loan Documents are, to the best of the Borrowers' knowledge, true, correct and complete in all material respects, all the covenants, terms and conditions of this Agreement or any other Loan Documents remain satisfied, the Loan remains in balance, and no Event of Default (hereinafter defined), or circumstance or event which upon the lapse of time, the giving of notice, or both could become an Event of Default, has occurred as the date thereof.

(q)     Certificate of Need/License. Evidence reasonably satisfactory to Lender that the Borrowers have final, non-appealable and exclusive rights of ownership of all Permits needed for operation of the sixty-four (64)-bed nursing home beds at the Premises which beds are eligible to be licensed by the Pennsylvania Departments of Health and are qualified to be certified by Medicare and Medicaid.

(r)     Title Binder or Policy Update. The Title Insurer identified in Paragraph 6 hereof shall update the mortgage title insurance showing no change in the status or matters affecting title to the Premises (other than as set forth in the original title insurance policy) and reflecting the nonexistence of intervening liens, including mechanics' and materialmen's liens and other statutory liens, whether inchoate or not.

(s)     Depository Account. The membership equity account currently deposited at FirstMerit shall be increased from Six Hundred Thousand and no/100 Dollars ($600,000.00) to Six Hundred Thirty Three Thousand Three Hundred and no/100 Dollars ($633,300.00)

**14.   Affirmative Agreements.** In addition to any other covenants and agreements of the Borrowers, the Borrowers agree that from the date hereof and until payment in full of all Obligations, unless Lender shall otherwise consent in writing, the Borrowers shall:

(a) Payment of Loan/Performance of Loan Obligations. Duly and punctually pay or cause to be paid the principal and interest of the Notes in accordance with its terms and duly and punctually pay and perform or cause to be paid or performed all Obligations hereunder and under the other Loan Documents.

(b) Business Existence, Etc. Cause to be done all things needed to preserve the Borrowers' and Lessee's rights and franchises and comply with all laws applicable to the Borrowers; continue to conduct the Borrowers' business substantially as the Borrowers have during the present year; and, at all times, maintain such insurance, to such extent and against such risks, including, fire, theft, workmen's compensation claims, general liability and property damage, as is customary with companies in the same or similar business, providing a schedule of same to Lender.

(c) Payment of Indebtedness, Etc.

(i) Prompt Payment. Promptly pay all of the Obligations and all Indebtedness;

(ii) Discharge Liens, Etc. Pay promptly all taxes, assessments and governmental charges imposed upon the Borrowers, the Borrowers' businesses and the Premises before they are in default, as well as all lawful claims for labor, materials and supplies or otherwise which, if unpaid, might become a lien upon the Borrowers' properties unless the above are being contested in good faith by appropriate proceedings and with adequate reserves; and

(iii) Performance of Obligations. Perform all of its obligations under the Lease with respect to the Premises.

24

(d) Notice of Default. Promptly notify Lender of any material default by the Borrowers relating to any Indebtedness of the Borrowers or any material, contractual obligation of the Borrowers.

(e) Depository Account. The Borrowers shall establish and maintain their primary depository banking relationship with Lender until the Obligations incurred hereunder have been fully repaid.

(f) Representations. The Borrowers covenant, for the term of this Agreement that the representations set forth herein are correct and continuing and the Borrowers will, within ten (10) days of its knowledge thereof, give written notice to Lender of the existence of any event which would prohibit the Borrowers from continuing to make the representations set forth in this Agreement.

(g) Compliance With Law. The Borrowers shall comply in all material respects, with all statutes, laws, ordinances and governmental rules, regulations and ordinances to which it is subject or which are applicable to the Premises, the Improvements or the Borrowers' business, properties or assets.

(h) Condition and Repair. The Borrowers shall maintain or cause to be maintained in good repair, working order and condition, all properties used or useful in the business of the Borrowers related to the Premises and/or the Improvements from time to time shall make or cause to be made all appropriate repairs, renewals and replacements thereof.

(i) Further Assurances. At Lender's reasonable request, promptly execute or cause to be executed and deliver to Lender any and all documents, instruments, agreements and information deemed necessary by Lender, in Lender's reasonable discretion, to perfect or to continue the perfection of Lender's liens created hereunder, to facilitate the collection of the Collateral or otherwise to give effect to or carry out the terms or intent of this Agreement or any of the other Loan Documents.

(j) Accrual and Payment of Taxes. During each fiscal year, make accurate provision for the payment of all current tax liabilities of all kinds including, without limitation, federal and state income taxes, franchise taxes, payroll taxes, all required withholding of income taxes of employees, all required old age and unemployment contributions, and all required payments to employee benefit plans, and pay the same when they become due.

(k) Insurance. At all times while the Obligations are outstanding, maintain or pursuant and in accordance with the Leases, cause any tenant thereunder to maintain (and provide satisfactory evidence thereof to Lender) the following insurance:

    (i)    General liability insurance (including professional liability coverage) in an amount equal to at least $1,000,000 per occurrence and $3,000,000 in the aggregate;

    (ii)    "All-risk" coverage on the Premises and the Improvements, in an amount not less than the replacement cost thereof (but in no event less than $2,813,700.00), insuring against such potential causes of loss as shall be required by Lender, including but not limited to loss or damage from wind, lightning, fire, explosion, riot, civil commotion, aircraft, vehicle, smoke, flood, mudslide, hail, ice and subsidence, and, if customary for the geographic area and if requested by Lender, earthquake; and

    (iii)    Business interruption insurance (including rental value for the Premises and the Improvements) equal to not less than twelve (12) months estimated gross revenues less expenses not ordinarily incurred during the period of business interruption.

Each of the policies described in (k)(i) shall name the Lender as an additional insured. Each of the policies described in (k)(ii) through (iii) shall name Lender as mortgagee and loss payee under a standard noncontributory mortgagee and lender loss payable clause, and shall provide that Lender shall receive not less than thirty (30) days written notice prior to cancellation. The proceeds of any of the policies described in (k)(ii) through (iii) shall be payable by check payable to Lender, delivered to Lender, and such proceeds shall be applied by Lender, at its reasonable option (unless otherwise provided in the Mortgages), either (i) to the full or partial payment or prepayment of the Obligations (without premium), or (ii) to the repair and/or restoration of the

Improvements damaged or taken. Each of the policies described in (k)(ii) through (iii) must be written by a solvent insurer licensed to do business in the state in which the Facility is located.

(l) <u>Notification</u>. The Borrowers shall promptly provide Lender with at least thirty (30) days prior written notice of: (i) any change in any location where the Borrowers' inventory is maintained, and any new locations where the Borrowers' inventory is to be maintained; (ii) any change in the location of the office where the Borrowers' records pertaining to their respective accounts and contract rights are kept; (iii) the location of any new places of business for the Borrowers and the changing or closing of any of its existing places of business; (iv) any change in Borrower's name or state of organization or state or incorporation, as applicable; and (v) any change in the Borrowers' place of business.

(m) <u>Special Covenants</u>. The Borrowers shall or pursuant to the Leases, cause any tenant thereunder, to: (i) furnish to Lender within thirty (30) days of receipt, a copy of any Medicare, Medicaid, or other licensing or certification agency survey, audit or report and any statement of deficiencies and/or any other report indicating that any action is pending or being considered to downgrade the Facility to a substandard category, and within the time period required by the particular agency for furnishing a plan of correction also furnish or cause to be furnished to Lender a copy of the plan of correction generated from such survey or report for the Facility, and correct or cause to be corrected any deficiency, the curing of which is a condition of continued licensure, certification or for full participation in Medicaid, Medicare or other reimbursement program pursuant to any Reimbursement Contract for existing residents or for new residents to be admitted with Medicaid or Medicare coverage, by the date required for cure by such agency (plus extensions granted by such agency); (ii) furnish to Lender within twenty (20) days after filing or receipt, all Medicare and Medicaid cost reports and any amendments thereto filed with respect to the Facility and all responses, audit reports, or other inquiries with respect to such cost reports; (iii) comply, in all material respects, with all applicable covenants and restrictions of record and all laws, ordinances, rules and regulations and keep the Facility in compliance with all applicable laws, ordinances, rules and regulations, including, without limitation, the Americans with Disabilities Act and regulations promulgated thereunder, and laws, ordinances, rules and regulations relating to zoning, health, building costs, setback requirements, Medicaid and Medicare laws and keep the Permits for the Facility in full force and effect.

(n) <u>Company Existence</u>. The Borrowers shall maintain and preserve its company existence, rights and franchises in full force and effect and comply with the requirements of all applicable laws, rules, regulations and orders and conduct its business in such a manner as not to endanger the sixty-four (64)-bed long-term nursing home licensure with the Pennsylvania Departments of Health relating to the Facility.

(o) <u>Premises and Improvements</u>. The Borrowers shall or pursuant to the Leases, cause any tenant thereunder to obtain, maintain, keep and preserve the Premises and the Improvements in such condition as to qualify for unconditional licensure to operate as sixty-four (64)-bed long-term nursing home facility, and take all steps necessary to maintain such licensure under the laws of the Commonwealth of Pennsylvania and regulations and guidelines promulgated thereunder, and in connection therewith the Premises shall continue to be operated at all times during the terms of the Loan as a sixty-four (64)-bed licensed nursing home facility.

**15.** <u>Negative Covenants</u>. In addition to any other covenants and agreements of the Borrowers' hereunder, the Borrowers agrees that from the date hereof and until payment in full of all Obligations, unless Lender shall otherwise consent in writing, the Borrowers shall not:

(a) <u>Indebtedness</u>. Except for the Notes created, incur, assume or permit to exist any Indebtedness or liability of the Borrowers, the Premises or the Improvements in excess of One Hundred Thousand and no/100 Dollars ($100,000.00) in the aggregate during any twelve (12) consecutive month period during the term of the Loan.

(b) <u>Liens</u>. Create, incur, encumber, assume or permit to exist any lien or other encumbrance on the Premises, the Improvements, or on any of the Borrowers' properties, rights, income or other assets, including, but not limited to, the Collateral whether now owned or hereafter acquired, other than the liens or the Mortgages and the Permitted Encumbrances and the Security Agreements, notwithstanding that any such lien or encumbrance is junior and subordinated to the liens of Lender, the Premises, the Facility, the Permits, the Improvements or the goods, materials, equipment, fixtures

26

or any other personal property now existing on or used in or about the Premises, the Improvements or hereafter acquired for the installation or use in, on or about the Premises, or the Improvements.

(c)    Guaranty.  Guaranty, assume or otherwise be responsible for indebtedness or obligations of any other Person, except in favor of Lender.

(d)    Conduct of Business.

(i)  Make any material change in the nature of its business as it is being conducted as of the date hereof,

(ii)  Dissolve, merge, consolidate or consummate any similar transaction with or into any other Person, or otherwise change its identity or company structure,

(iii)  Sell, lease (except for the Leases), transfer or otherwise dispose of the Premises, the Collateral, or all or a substantial part of its assets, whether now owned or hereinafter acquired,

(iv)  Change its method of accounting, unless such change is permitted by generally accepted accounting principles consistently applied, and provided such change does not have the effect of curing or preventing what would otherwise be an Event of Default had such change not taken place,

(v)  Change its name, trade name, or articles of incorporation,

(vi)  Change its shareholders, members, stock ownership, membership ownership or capital structure,

(vii)  Change its chief executive office or its principal place of business,

(viii)  Make any loans or advances to its officers, directors, shareholders and/or members.

(e)    Ownership.  Permit a transfer of any legal or equitable interest in its capital, membership or shareholder interests to any Person, including, but not limited to, present members or shareholders.

(f)    Distributions and Dividends.  Authorize any distribution or dividends on any membership, shareholder interest, or capital interest, whether now or hereafter outstanding, or make any payment on account of the purchase, acquisition, redemption or other retirement of any such membership, shareholder interest or capital interest, or make any payment on Subordinated Debt.  Notwithstanding anything to the contrary set forth herein, the Borrowers may authorize distributions, dividends, or payments to any existing shareholder or capital interest holder for purposes of satisfying the annual income tax liability of any such person with respect to such person's shareholder or capital interest.

(g)    Leases; Investments.

(i)  Create, incur, assume or suffer to exist any lease obligation (except for the Leases with respect to the Premises reasonably approved by Lender and in accordance with this Agreement and the Mortgages),

(ii)  Make any investment in, or make any loan or advance to, any Person, including but not limited to, members, shareholders, directors or officers of the Borrowers or members, partners or shareholders of any entity member or shareholder of the Borrowers, or

(iii)  Purchase or acquire obligations owned by others.

(h)    Transactions With Affiliates.  Enter into any transaction with an Affiliate of the Borrowers other than in the ordinary course of its business and on fair and reasonable terms no less favorable to the Borrowers, than those they could obtain in a comparable arms-length transaction with a Person not an Affiliate.

(i)    Debt Service Coverage Ratios.  The Borrowers shall not permit the Debt Service Ratio to be less than 1.25 to 1.00.  The Borrowers shall provide Bank a written report evidencing compliance with the foregoing ratio for the

preceding twelve month period, within thirty (30) days of the end of its fiscal year. Capitalized terms used in this Subsection (15)(i) shall have the meanings commonly ascribed to such terms in accordance with GAAP.

(j)     Capital Expenditures. Unless otherwise required of the Borrowers pursuant to the Lease, The Borrowers shall not make any plant or fixed capital expenditure, or any commitment therefor, or obtain equipment subject to a purchase money security interest, trust deed or least, in any fiscal year on a consolidated basis, which in the aggregate are in excess of One Hundred Thousand and no/100 Dollars ($100,000.00) per fiscal year, without lender's consent.

**16. Environmental Hazards.**

(a)     Prohibited Activities and Conditions. The Borrowers shall not cause or permit any of the following:

(i)     The presence, use, generation, release, treatment, processing, storage (including storage in above ground and underground storage tanks), handling, or disposal-of any Hazardous Materials in, on or under the Premises and/or Improvements, except for biohazardous waste generated in the ordinary course of owning and/or operating the Facility and in accordance with all applicable laws;

(ii)     The transportation of any Hazardous Materials to, from, or across the Premises and/or Improvements;

(iii)     Any occurrence or condition on the Premises and/or Improvements or any other property of the Borrowers that is adjacent to the Premises and/or Improvements, which occurrence or condition is or may be in violation of Hazardous Materials Laws; or

(iv)     Any violation of or noncompliance with the terms of any Environmental Permit with respect to the Premises, the Improvements or any property of the Borrowers that is adjacent to the Premises.

The matters described in clauses (i) through (iv) above are referred to collectively in this Paragraph 16 as "Prohibited Activities and Conditions" and individually as a "Prohibited Activity and Condition."

(b)     The Borrowers' Environmental Representations and Warranties. The Borrowers represent and warrant to Lender that:

(i)     The Borrowers have not at any time caused or permitted any Prohibited Activities and Conditions.

(ii)     To the actual knowledge of the Borrowers, no Prohibited Activities and Conditions exist or have existed.

(iii)     The Premises and the Improvements do not now contain any underground storage tanks, and, to the actual knowledge of the Borrowers after reasonable and diligent inquiry, the Premises and the Improvements have not contained any underground storage tanks in the past. If there is an underground storage tank located on the Premises or the Improvements which has been previously disclosed by the Borrowers to Lender in writing, that tank complies with all requirements of Hazardous Materials Laws.

(iv)     The Borrowers have complied with, in all material respects, all Hazardous Materials Laws, including all requirements for notification regarding releases of Hazardous Materials. Without limiting the generality of the foregoing, the Borrowers have obtained all Environmental Permits required for the operation of the Premises and/or the Improvements in accordance with Hazardous Materials Laws now in effect and all such Environmental Permits are in full force and effect. No event has occurred with respect to the Premises and/or Improvements that constitutes, or with the passing of time or the giving of notice would constitute, noncompliance with the terms of any Environmental Permit.

(v)     There are no actions, suits, claims or proceedings pending or, to the actual knowledge of the Borrowers, threatened that involves the Premises and/or the Improvements and allege, arise out of, or relate to any Prohibited Activity and Condition.

(vi)    The Borrowers have not received any complaint, order, notice of violation or other communication from any Governmental Authority with regard to air emissions, water discharges, noise emissions or Hazardous Materials, or any other environmental, health or safety matters affecting the Premises, the Improvements or any other property of the Borrowers that is adjacent to the Premises. The representations and warranties in this Paragraph 16 shall be continuing representations and warranties that shall be deemed to be made by Borrower throughout the term of the Loan until the Obligations have been paid in full.

(c)     Costs of Inspection.  The Borrowers shall pay promptly the costs of any environmental inspections, tests or audits required by Lender in connection with any foreclosure or deed in lieu of foreclosure, or required by Lender following a reasonable determination by Lender that Prohibited Activities and Conditions may exist. Any such costs incurred by Lender (including the fees and out-of-pocket costs of attorneys and technical consultants whether incurred in connection with any judicial or administrative process or otherwise) which Borrower fails to pay promptly shall become an additional part of the Obligations.

(d)     Indemnity.

(A)     The Borrowers shall indemnify, hold harmless and defend (i) Lender, (ii) any prior owner or holder of the Note, (iii) the officers, directors, partners, agents, shareholders, employees and trustees of any of the foregoing, and (iv) the heirs, legal representatives, successors and assigns (excluding third party purchasers for value) of each of the foregoing (together, the "Indemnitees") against all proceedings, claims, damages, losses, expenses, penalties and costs (whether initiated or sought by any Governmental Authority or private parties, including fees and out of pocket expenses of attorneys and expert witnesses, investigatory fees, and remediation costs, whether incurred in connection with any judicial or administrative process or otherwise, arising directly or indirectly from any of the following:

(1)     Any breach of any representation or warranty of the Borrowers in this Paragraph 16,

(2)     Any failure by the Borrowers to perform any of its obligations under this Paragraph 16,

(3)     The existence or alleged existence of any Prohibited Activity and Condition,

(4)     The presence or alleged presence of Hazardous Materials in, on, around or under the Premises, and/or Improvements or any property of the Borrowers that is adjacent to the Premises, or

(5)     Actual or alleged violation of any Hazardous Materials Law.

(B)     The Borrowers shall not, without the prior written consent of those Indemnitees who are named as parties to a claim or legal or administrative proceeding (a "Claim"), settle or compromise the Claim if the settlement (i) results in the entry of any judgment that does not include as an unconditional term the delivery by the claimant or plaintiff to Lender of a written release of those Indemnitees, reasonably satisfactory in form and substance to Lender; or (ii) may materially and adversely affect any Indemnitee, as determined by such Indemnitee in its reasonable discretion.

(C)     The liability of the Borrowers to indemnify the Indemnitees shall not be limited or impaired by any of the following, or by any failure of the Borrowers to receive notice of or consideration for any of the following:

(1)     Any amendment or modification of any Loan Document.

(2)     Any extensions of time for performance required by any of the Loan Documents.

(3)     The accuracy or inaccuracy of any representations and warranties made by the Borrowers under this Agreement or any other Loan Document.

(4)     The release of the Borrowers or any other Person, by Lender or by operation of law, from performance of any Obligations under any of the Loan Documents.

(5)     The release or substitution in whole or in part of any security for the Obligations.

(6)     Lender's failure to properly perfect any lien or security interest given as security for the Obligations.

(D)     The provisions of this Paragraph 16 shall be in addition to any and all other obligations and liabilities that the Borrowers may have under the applicable law or under the other Loan Documents, and each Indemnitee shall be entitled to indemnification under this Paragraph 16 without regard to whether Lender or that Indemnitee has exercised any rights against the Premises and/or the Improvements or any other security, pursued any rights against the Borrowers, or pursued any other rights available under the Loan Documents or applicable law. If Borrower consists of more than one person or entity, the obligation of those persons or entities to indemnify the Indemnitees under this Paragraph 16 shall be joint and several. The obligations of Borrower to indemnify the Indemnitees under this Paragraph 16 shall survive any repayment or discharge of the Obligations, any foreclosure proceeding, any foreclosure sale, any delivery or any deed in lieu of foreclosure, and any release of record of the lien of the Mortgages.

**17.  Events of Default.**  (a) The occurrence of any one or more of the following shall constitute an "Event of Default" hereunder:

(i)     The default or failure by the Borrowers to pay any of the Obligations, including, but not limited to, under the Note, within ten (10) days after the same becomes due; or

(ii)    The breach or violation of any covenant set forth in Paragraphs 15 or 16 hereof; or

(iii)   The Borrowers' or Guarantors' failure to deliver or cause to be delivered the financial statements and information set forth in Paragraph 8 hereof within the times required and such failure is not cured within thirty (30) days following Lender's written notice to the Borrowers or Guarantors thereof; or

(iv)    Any representation or warranty made herein or in connection herewith is misleading in any material respect; or

(v)     The failure of the Borrowers properly and timely to perform or observe any covenant or condition set forth in this Agreement (other than those specified in (i), (ii), (iii) and (iv) of this Paragraph 17) or any other Loan Documents which is susceptible of being cured and is not cured within any applicable cure period as set forth herein or, if no cure period is specified therefor, is not cured within thirty (30) days of Lender's written notice to the Borrowers of such default or such longer period of time as may be necessary to cure such default; provided, however, that the Borrowers has commenced to cure such default within said 30-day period and continues to diligently pursue such cure in good faith utilizing all reasonable efforts; however, in no circumstance shall this period exceed ninety (90) days; or

(vi)    Any certificate, statement, representation, warranty or audit heretofore or hereafter furnished by or on behalf of the Borrowers pursuant to or in connection with this Agreement (including, without limitation, representations and warranties contained herein or in any Loan Documents) or as an inducement to Lender to make the Loan to the Borrowers, proves to have been false in any material respect at the time when the facts therein set forth were stated or certified, or proves to have omitted any substantial contingent or unliquidated liability or claim against the Borrowers or on the date of execution of this Agreement there shall have been any materially adverse change in any of the acts previously disclosed by any such certificate, statement, representation, warranty or audit, which change shall not have been disclosed to Lender in writing at or prior to the time of such execution; or

Case 1:10-bk-05235-MDF    Doc 45-2    Filed 07/09/10    Entered 07/09/10 14:36:59    Desc
Exhibit B    Page 30 of 51

(vii) A final judgment shall be rendered by a court of law or equity which is not appealed or is non-appealable against the Borrowers, and the same shall remain undischarged for a period of (30) days, unless such judgment is either (i) fully covered by collectible insurance and such insurer has within such period acknowledged such coverage in writing, or (ii) although not fully covered by insurance, enforcement of such judgment has been effectively stayed, such judgment is being contested or appealed by appropriate proceedings and the Borrowers have established reserves adequate for payment in the event such Person is ultimately unsuccessful in such contest or appeal and evidence thereof is provided to Lender; or

(viii) The occurrence of any materially adverse change in the financial condition or prospects of the Borrowers or Guarantor, or the existence of any other condition which, in Lender's reasonable determination, constitutes a material impairment of the Borrowers' ability to own, operate, lease or manage the Premises or of the Borrowers' or Guarantors' ability to pay or perform their respective obligations under the Loan Documents, and if such condition is capable of being cured, is not remedied within thirty (30) days after written notice; or

(ix) In the event that a mechanics' or materialmen's lien is perfected upon the Premises (which lien is not discharged of record within thirty (30) days from the Borrowers' knowledge of liens, unless the Borrowers are, in good faith, contesting the validity of such lien, in which case the Borrowers shall post bond to fully indemnify said lien in favor of Lender); or

(x) Material default by the Borrowers with respect to any Indebtedness (other than the Obligations) of the Borrowers when due or the performance of any other obligation incurred in connection with any Indebtedness of the Borrowers for borrowed money which is not cured within any applicable grace period; or

(xi) There shall occur any event of default on the part of the Borrowers (including specifically, but without limitation, due to non-payment or non-performance) under any other loan made by Lender to the Borrowers or to any Affiliate, or under or any other agreement, document or instrument, or other loan, to which the Borrowers or any Affiliate is now or hereafter a party, or by which any of their property is bound, creating or relating to any indebtedness or with respect to any obligation, and such event of default is not cured within any applicable grace period; or

(xii) The death of Guarantor, or if the Borrowers, dissolve, wind up its affairs, liquidates, merges, reorganizes, consolidates, terminates its existence or engages in any similar event or transaction; or

(xiii) The Borrowers abandon the Premises or any material portion thereof; or

(xiv) An event occurs causing Lender to reasonably believe acting in good faith that the prospect of repayment of the Loan or the performance of the Borrowers' or Guarantors' obligations under this Agreement or any of the other Loan Documents is materially impaired; or

(xv) The Borrowers or Guarantors shall:

  (aa) apply for or consent to the appointment of a receiver, trustee or liquidator for the Borrowers or Guarantors or for any of the Borrowers' or Guarantors' properties or assets,

  (bb) admit in writing the inability to pay debts,

  (cc) make a general assignment for the benefit of creditors,

  (dd) be adjudicated bankrupt or insolvent, or

  (ee) file a voluntary petition in Bankruptcy, or a petition or answer seeking reorganization or an arrangement with creditors or to take advantage of any Bankruptcy, reorganization, insolvency,

31

or liquidation law, or an answer admitting the material allegations of a petition filed against it/him in any proceeding under any such law; or

(xvi)   An order shall be entered, without the application or consent of the Borrowers or Guarantors, by any court approving a petition seeking reorganization of the Borrowers or Guarantors or of all or a substantial part of the properties or assets of the Borrowers or the Guarantors or appointing a receiver, trustee or liquidator of the Borrowers or Guarantors and such order shall continue unstayed and in effect for a period of sixty (60) days or more. The institution of any garnishment proceedings by attachment, levy or otherwise, against any deposit balance maintained or any property deposited with Lender by the Borrowers or Guarantors and such proceeding is not discharged within thirty (30) days of its commencement; or

(xvii)  The failure of the Borrowers to correct, within the time deadlines set by any applicable Medicare, Medicaid or licensing or certifying agency, any deficiency which would result in the following actions by such agency with respect to the Premises;

(aa)   a termination of any Reimbursement Contract (other than private insurance or managed care agreements terminated by The Borrowers in the ordinary course of business as a prudent business decision which is in the best interests of The Borrowers and the Premises, provided that such termination is not related to quality of care issues) or any Permit; or

(bb)   a ban or restriction on new admissions generally or on admission of residents otherwise qualifying for Medicare or Medicaid coverage; provided that, if no other Event of Default has occurred and a restriction or ban on admission is imposed without prior notice (or without sufficient notice to allow The Borrowers, using best efforts, to correct a cited deficiency within the stated time for correcting such deficiency), and The Borrowers are diligently pursuing a correction of any cited deficiency or noncompliance, such a restriction or ban shall not constitute an Event of Default if it is lifted or removed within thirty (30) days; or

(xviii) If Lender shall not receive, within forty-five (45) days after each month, monthly accounts receivable and accounts payable aging upon request by Lender when the Facility is in use; or

(xix)   The Borrowers and/or the Premises fail to be licensed by the Pennsylvania Department of Health as a sixty-four (64)-bed nursing home facility; fail to be licensed by the Pennsylvania Department of Health as a sixty-four (64)-bed nursing home facility; or the assessment against the Borrowers or the Premises of any fines or penalties by any state of any Medicare, Medicaid, health, licensing or certification agency having jurisdiction over the Borrowers or the Premises in excess of $25,000; or

(xx)    The material breach of any of the Borrowers' representations or warranties contained in this Agreement or under the Mortgages, the Note or the other Loan Documents given and granted by the Borrowers to Lender in connection with the Loan; or

(xxi)   Any breach, violation, failure to perform or other default or event of default by the Borrowers under the Lease, subject to any applicable cure periods stated therein.

Notwithstanding anything in this Paragraph 17, all requirements of notice shall be deemed eliminated if Lender is prevented from declaring an Event of Default by bankruptcy or other applicable law. The cure period, if any, shall then run from the occurrence of the event or condition of default rather than from the date of notice.

(b) Remedies of Lender. Upon the occurrence of an Event of Default, Lender may, at its option, without further demand or notice of any kind or any appraisal or evaluation, all of which are hereby expressly waived by the Borrower:

(i)     Terminate this Agreement without affecting the Borrowers' or Guarantors' liability for any breach, violation or default occurring prior thereto;

(ii)     Pay any taxes, discharge any lien, procure any insurance or cure any default by the Borrowers or Guarantors from the unexpended portion of the Loan or by advancing necessary funds to be secured by the Mortgage;

(iii)    Accelerate the payment of the Note and declare the Note secured by the Mortgages and any or all Obligations due and payable forthwith in full, both as to principal and interest, anything contained in this Agreement or the Loan Documents to the contrary notwithstanding, and commence any appropriate legal and/or equitable action to foreclose the Mortgages or exercise any available power of sale, and collect all such amounts due Lender with interest thereon at the Default Rate stated in the Note;

(iv)    Employ security personnel to protect the Premises, the cost of which shall be added to the Loan and secured by the Mortgages;

(v)     Commence any appropriate legal and/or equitable action to enforce performance under this Agreement or any of the other Loan Documents; and/or

(vi)    Exercise any other rights or remedies Lender may have under the Mortgages or other Loan Documents, or which may be available by statute, at law or in equity against or with respect to the Borrowers, the Premises, any other security or collateral, either simultaneously or in such order and manner as Lender in its reasonable discretion may elect, in each instance without prejudice to or impairment of any of Lender's other rights or remedies.

(c)  No Waiver.  The remedies herein provided shall be in addition to and not in substitution of any rights and remedies otherwise available to Lender in law or equity, or under the Note, the Mortgages or any other Loan Document. The delay, failure or omission to exercise any of its rights or remedies herein or otherwise by Lender shall not preclude or impair subsequent resort to such right or remedy or the concurrent or subsequent resort to any other remedy, nor shall the exercise or partial exercise of any right or remedy prevent or impair the subsequent or concurrent resort to any other right or remedy.  No delay or omission by Lender in exercising any right or remedy shall be construed as a waiver of any such Event of Default or any such right or remedy.  Every right and remedy of Lender may be exercised from time to time and as often as shall be deemed expedient or advisable by Lender.  No waiver of any Event of Default shall extend to or affect any other Event of Default.

**18.  Lender's Right to Cure.**  If the Borrowers fail to make any payment or perform any act required to be made or performed under this Agreement, the Notes, the Mortgages or any other Loan Document, and such failure is or becomes an Event of Default, Lender, without demand upon the Borrowers and without waiving or releasing any obligation or default, may (but shall be under no obligation to) make such payment or perform such act for the account and at the expense of the Borrowers and may enter upon the Premises, or any part thereof for such purpose and take all such action thereon as, in its sole opinion, may be necessary or appropriate therefore and in accordance with applicable law, all without prejudice to any other rights or remedies available to Lender.  All payments so made by Lender and all costs, fees and expenses incurred in connection therewith or in connection with the performance by Lender of any such act, together with interest thereon at the Default Rate stated in the Notes from the date of payment or incurrence, shall constitute additional indebtedness secured by the Mortgages and shall be paid by the Borrowers to Lender on demand.

**19.  General Conditions.**

(a)     Indemnification.  The Borrowers shall, at its sole cost and expense, protect, defend, indemnify and hold harmless the Indemnified Parties (as defined below) from and against any and all claims, suits, liabilities (including, without limitation, strict liabilities), actions, proceedings, obligations, debts, damages, losses, costs, expenses, diminution in value, fines, penalties, charges, fees, expenses, judgment, awards, amounts paid in settlement, punitive damages, foreseeable and unforeseeable consequential damages, of whatever kind or nature (including but not limited to reasonable attorneys' fees and other costs of defense) imposed upon or incurred by or asserted against Lender by reason of (a) ownership of the Notes, the Mortgages, the Premises, the Improvements or any interest therein or receipt of any Rents (as defined in the Assignment of Rents included in Mortgages???); (b) any amendment to, or restructuring of, the Obligations and/or any of the Loan Documents; (c) any and all lawful action that may be taken by Lender in connection with the enforcement of the provisions of the Mortgages or the Note or any of the other Loan Documents, whether or not suit is

filed in connection with same, or in connection with the Borrowers, Guarantors, and/or any partner, joint venturer, member or shareholder thereof becoming a party to a voluntary or involuntary federal or state bankruptcy, insolvency or similar proceeding; (d) any accident, injury to or death of persons or loss of or damage to property occurring in, on or about the Premises, the Improvements or any part thereof or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (e) any use, nonuse or condition in, on or about the Premises, the Improvements or any part thereof or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (f) any failure on the part of the Borrowers to perform or comply with any of the terms of this Agreement or any of the other Loan Documents; (g) any claims by any broker, person or entity claiming to have participated in arranging the making of the Loan evidenced by the Note; (h) any failure of the Premises or the Improvements to be in compliance with any applicable laws; and (i) any and all claims and demands whatsoever which may be asserted against Lender by reason of any alleged obligations or undertakings on its part to perform or discharge any of the terms, covenants, or agreements contained in any lease with respect to the Premises, the Improvements or any replacement or renewal thereof or substitution therefor. Any amounts payable to Lender by reason of the application of this Paragraph 19(a) shall become immediately due and payable, and shall constitute a portion of the Obligations, shall be secured by the Mortgages and shall accrue interest at the Default Rate (as defined in the Note). The obligations and liabilities of the Borrowers under this Paragraph 19(a) shall survive any termination, satisfaction, assignment, entry of a judgment of foreclosure or exercise of a power of sale or delivery of a deed in lieu of foreclosure of the Mortgages. For purposes of this Paragraph 19(a), the term "Indemnified Parties" means Lender and any Person who is or will have been involved in the origination of the Loan, any Person who is or will have been involved in the servicing of the Loan, any Person in whose name the encumbrance created by the Mortgages is or will have been recorded, any Person who may hold or acquire or will have held a full or partial interest in the Loan (including, without limitation, any investor in any securities backed in whole or in part by the Loan) as well as the respective directors, officers, shareholder, partners, members, employees, agents, servants, representatives, contractors, subcontractors, affiliates, subsidiaries, participants, successors and assigns of any and all of the foregoing (including, without limitation, any other Person who holds or acquires or will have held a participation or other full or partial interest in the Loan or the Premises, whether during the term of the Mortgage or as a part of or following a foreclosure of the Loan and including, without limitation, any successors by merger, consolidation or acquisition of all or a substantial portion of Lender's assets and business). The obligations and liabilities of Borrower under this Paragraph 19(a) shall not apply to any indemnification resulting in whole or in part from Lender's gross negligence or willful misconduct.

(b) <u>Submission of Evidence</u>. Any condition of this Agreement which requires the submission of evidence of the existence or non-existence of a specified fact or facts implies as a condition the existence or non-existence, as the case may be, of such fact or facts, and Lender shall, at all times, be free to independently establish to its satisfaction such existence or non-existence.

(c) <u>Lender Sole Beneficiary</u>. All terms, provisions, covenants and other conditions of the obligations of Lender to make the Loan hereunder are imposed solely and exclusively for the benefit of Lender and its successors and assigns, and no other person shall have standing to require satisfaction of such terms, covenants and other conditions in accordance with their terms or be entitled to assume that Lender will refuse to make the Loan in the absence of strict compliance with any or all of such terms, covenants and other conditions and no person other than Lender and its successors and assigns shall, under any circumstances, be deemed to be a beneficiary of such terms, covenants and other conditions, any or all of which may be freely waived, in whole or in part, by Lender at any time if, in Lender's reasonable discretion, Lender deems it advisable or desirable to do so.

(d) <u>Severability of Provisions</u>. Any provision of this Agreement which is prohibited or unenforceable in the Commonwealth of Pennsylvania or in any jurisdiction in the United States shall, as to the Commonwealth of Pennsylvania or such jurisdiction in the United States, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

(e) <u>Headings</u>. The headings and captions of various paragraphs of this Agreement are for convenience of reference only and are not to be construed as defining or limiting, in any way, the scope or intent of the provisions hereof.

(f) <u>No Joint Venture</u>. The Borrowers are not and shall not be deemed to be a joint venturer with, or an agent of, Lender for any purpose.

(g) Incorporation By Reference. The Borrowers agree that until this Agreement is terminated by the repayment to Lender of all principal and interest due and owing on the Notes and other sums due and owing pursuant to the other Loan Documents, the Notes and the other Loan Documents shall be made subject to all the terms, covenants, conditions, obligations, stipulations and agreements contained in this Agreement to the same extent and effect as if fully set forth in and made a part of the Notes and the other Loan Documents. In the event of a conflict between any of the Loan Documents and the provisions of this Agreement, this Agreement shall be controlling.

(h) Further Assurances. The Borrowers hereby agree promptly to execute and deliver such additional documents, agreements and instruments and promptly to take such additional action as Lender may at any time and from time to time reasonably request in writing in order for Lender to obtain the full benefits and rights granted or purported to be granted by this Agreement. In addition, the Borrowers further agrees and consents that without notice and without affecting liability under this Agreement, the Note or any of the other Loan Documents, Lender at any time or times is authorized to correct patent errors and fill in blanks in this Agreement, the Notes or any of the other Loan Documents, with information that is consistent with the terms hereof.

**20. Inspections.** Lender, through its officers, agents, employees or designees, shall have the right at all reasonable times and upon twenty-four (24) hours prior written notice to enter upon the Premises and inspect the Premises to determine that the same are in conformity with all of the requirements described herein.

**21. Costs and Expenses.** The Borrowers will bear all direct and indirect taxes, fees, expenses, charges and expenses in connection with the Loan, the Notes, the preparation of this Agreement and the other Loan Documents (including any amendments hereafter made), and in connection with any modifications thereto and the recording of any of the Loan Documents. If, at any time, an Event of Default occurs (after the expiration of any applicable cure period, if any) or Lender becomes a party to any suit or proceeding in order to protect its interests or priority in any collateral for any of the Obligations or its rights under this Agreement or any of the Loan Documents, or if Lender is made a party to any suit or proceeding by virtue of the Loan, this Agreement or any Collateral and as a result of any of the foregoing, the Lender employs counsel to advise or provide other representation with respect to this Agreement, or to collect the balance of the Obligations, or to take any action in or with respect to any suit or proceeding relating to this Agreement, any of the other Loan Documents, any Collateral, or to protect, collect, or liquidate any of the security for the Obligations, or attempt to enforce any security interest or lien granted to the Lender by any of the Loan Documents, then in any such events, all of the attorney's fees arising from such services, including attorneys' fees for preparation of litigation and in any appellate or bankruptcy proceedings, and any expenses, costs and charges relating thereto shall constitute additional obligations or the Borrowers to the Lender payable on demand of the Lender. Without limiting the foregoing, the Borrowers have undertaken the obligation for payment of, and shall pay, all recording and filing fees, revenue or documentary stamps or taxes, intangibles taxes, and other taxes, expenses and charges payable in connection with this Agreement, any of the Loan Documents, the Obligations, or the filing of any financing statements or other instruments required to effectuate the purposes of this Agreement, and should the Borrowers fail to do so, the Borrowers agree to reimburse Lender for the amounts paid by Lender, together with penalties or interest, if any, incurred by Lender as a result of underpayment or nonpayment. Such amounts shall constitute a portion of the Obligations, shall be secured by the Mortgages and shall bear interest at the Default Rate (as defined in the Notes) from the date advanced until repaid.

**22. Notices.** Except for any notice required under applicable law to be given in another manner, any notice, demand, inquiry or other communication which any party hereto may be required to make or desire to give hereunder shall be in writing and shall be deemed to have been properly given (i) if hand delivered or if sent by telecopy, effective upon receipt or (ii) if delivered by overnight courier service, effective on the day following delivery to such courier service, or (iii) if mailed by United States registered or certified mail, postage prepaid, return receipt requested, effective two (2) days after deposit in the United States mail; addressed in each case addressed as follows to:

Borrowers:                Innovative Healthcare Properties LLC
438 Fairmount Street
Pittsburgh, Pennsylvania 15232
Attn: J. Gregory Cauterucci, Sr., President

Residence for Renal Care at Shadyside, Ltd.
5511 Baum Boulevard
Pittsburgh, Pennsylvania 15232
Attn: Marcia Yesko, Secretary

Center For Renal Care at Shadyside, Ltd
440 Fairmount Street
Pittsburgh, Pennsylvania 15232
Attn: Robert K. Nealon, Treasurer

Guarantors:

J. Gregory Cauterucci, Sr.
1090 Hemlock Drive
Blue Bell, Pennsylvania 19422

Phillip H. Krause
11 High Street
Pine Grove, Pennsylvania 17963

Robert K. Nealon
509 Colfax Avenue
Scranton, Pennsylvania 18510

Care First Management LLC
11 High Street
Pine Grove, Pennsylvania 17963
Attn: Phillip H. Krause, Vice President

Victor J. Bierman III
8415 Cherry Hill Lane
Broadview Heights, Ohio 44147

David P. Leone
315 Aberdeen Lane
Aurora, Ohio 44202

Bina Mehta
14714 Hillbrook Lane North
Chagrin Falls, Ohio 44022

John Y. Kim
6233 Michael Glen Lane
Sharon Center, Ohio 44281

Louis J. Capozzi
1655 Holly Pike
Carlisle, Pennsylvania 17013

Vincent E. Fisher
202 Kenilworth Drive
Akron, Ohio 44313

With copy to:    Roth Bierman LLP
5196 Richmond Road    ⊂ ⊊
Bedford Heights, Ohio 44146
Attn: Victor J. Bierman III, Esq.

Bank:       FirstMerit Bank, N.A.
7800 Reynolds Road
Mentor, Ohio 44060
Attn: Ken Sinha, Senior Vice President

With copy to:    Shapero & Green LLC
Signature Square II, Suite 220
25101 Chagrin Boulevard
Beachwood, Ohio 44122
Attn: Brian Green, Esq.

Either party may change its address to another single address by notice given as herein provided, except any change of address notice must be actually received in order to be effective.

**23. USA Patriot Act Notification.** The following notification is provided to the undersigned pursuant to Section 326 of the USA Patriot Act of 2001, 31 U.S.C. Section 5318:

IMPORTANT INFORMATION ABOUT PROCEDURES FOR OPENING A NEW ACCOUNT. To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each person or entity that opens an account, including any deposit account, treasury management account, loan, other extension of credit, or other financial services product. What this means for each of the undersigned: When the undersigned opens an account, if the undersigned is an individual, Bank will ask for the undersigned's name, taxpayer identification number, residential address, date of birth, and other information that will allow Bank to identify the undersigned, and, if the undersigned is not an individual, Bank will ask for the undersigned's name, taxpayer identification number, business address, and other information that will allow Bank to identify the undersigned. Bank may also ask, if the undersigned is an individual, to see the undersigned's driver's license, or other identifying documents, and, if the undersigned is not an individual, to see the undersigned's legal organizational documents or other identifying documents.

**24. Binding Effect.** This Agreement shall inure to the benefit of and be binding on the parties hereto and their respective heirs, legal representatives, successors and assigns; provided, however, that the Borrowers shall not assign or transfer the Loan, this Agreement or other Loan Documents, or any interest therein, and any such attempted assignment shall be void and of no effect.

**24. Entire Agreement.** This Agreement, the Notes, the Loan Documents and any other documents required to be executed and delivered by the Borrowers at closing in accordance with this Agreement, constitute the entire and complete agreement by and between Lender and the Borrowers concerning the loan described in this Agreement. No change, amendment or modification of or to this Agreement, the Notes, the Loan Documents and/or any of the other documents required to be executed and delivered by the Borrowers at closing in accordance with this Agreement shall be binding unless in writing and signed by Lender and the Borrowers.

37

**25.** <u>Survival; No Third Party Beneficiary; Time; and Gender</u>. All representations, warranties and agreements herein contained shall survive the closing. This Agreement is made and entered into for the sole protection and benefit of Lender and the Borrowers, their respective heirs, successors and assigns, and no other person shall have any right of action hereon. Time is of the essence hereof. Whenever used, the singular number shall include the plural, the plural the singular, and the use of any gender shall include all genders.

**26.** <u>Governing Law; Consent to Forum</u>. This Agreement and all other Loan Documents have been negotiated, executed and delivered at and shall be deemed to have been made in Pennsylvania. This Agreement and all other Loan Documents shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania; <u>provided, however</u>, that if any of the Collateral shall be located in any jurisdiction other than Pennsylvania, the laws of such jurisdiction shall govern the method, manner and procedure for foreclosure of Lender's lien upon such Collateral and the enforcement of Lender's other remedies with respect to such Collateral to the extent that the laws of such jurisdiction are different from or inconsistent with the laws of Pennsylvania. As part of the consideration for new value this day received, the Borrowers hereby consent to the jurisdiction of any state court located within the Commonwealth of Pennsylvania or federal court located within Pennsylvania and waives personal service of any and all process upon it and consents that all such service of process be made by certified or registered mail directed to the Borrowers at the address stated in Paragraph 22 and service so made shall be deemed to be completed upon actual receipt thereof. The Borrowers waive any objection to jurisdiction and venue of any action instituted against it as provided herein and agrees not to assert any defense based on lack of jurisdiction or venue.

**27.** <u>Waiver of Right to Trial By Jury</u>. The Borrowers and Lender each hereby unconditionally and irrevocably waive any and all right to trial by jury in any action, suit, counterclaim or cross-claim arising in connection with, out of or otherwise relating to this Agreement, the other Loan Documents, the Obligations, any Collateral or any transaction arising therefrom or related thereto.

Remainder of this page intentionally left blank

IN WITNESS WHEREOF, this Agreement has been executed by the Borrowers and Lender as of the date first above written.

**BANK:**

**FIRSTMERIT BANK, N.A.**
a national banking association

By: _____
Ken Sinha, Senior Vice President
(Authorized Representative)

**BORROWERS:**

**INNOVATIVE HEALTHCARE PROPERTIES, LLC**

a Pennsylvania limited liability company

By: _____
Its: PRESIDENT

Name: J. GREGORY CAUTERUCCI, SR.

**RESIDENCE FOR RENAL CARE AT SHADYSIDE, LTD.**

a Pennsylvania corporation

By: _____
Its: SECRETARY

Name: MARCIA YESKO

**CENTER FOR RENAL CARE AT SHADYSIDE, LTD.**

a Pennsylvania corporation

By: _____
Its: TREASURER

Name: ROBERT K. NEALON

39

GUARANTORS:

CARE FIRST MANAGEMENT, LLC

a Pennsylvania limited liability company

Unconditional and Continuing Guarantor

By: _____

Its: PRESIDENT

Name: J. GREGORY CAUTERUCCI, SR.


_____

Robert K. Nealon, Individually and as

Unconditional and Continuing Guarantor


_____

Phillip H. Krause, Individually and as

Unconditional and Continuing Guarantor


_____

J. Gregory Cauterucci, Sr., Individually and as

Unconditional and Continuing Guarantor


_____

Vincent E. Fisher, individually and

Limited Guarantor

_____

Louis J. Capozzi, individually and

Limited Guarantor

40

GUARANTORS:

**CARE FIRST MANAGEMENT, LLC**

a Pennsylvania limited liability company

Unconditional and Continuing Guarantor

By: _____

Its: PRESIDENT

Name: J. GREGORY CAUTERUCCI, SR.


_____

Robert K. Nealon, Individually and as

Unconditional and Continuing Guarantor


_____

Phillip H. Krause, Individually and as

Unconditional and Continuing Guarantor


_____

J. Gregory Cauterucci, Sr., Individually and as

Unconditional and Continuing Guarantor

_____

Vincent E. Fisher, individually and

Limited Guarantor


_____

Louis J. Capozzi, individually and

Limited Guarantor

40

**GUARANTORS:**

**CARE FIRST MANAGEMENT, LLC**

a Pennsylvania limited liability company

Unconditional and Continuing Guarantor

By: _____

Its: PRESIDENT

Name: J. GREGORY CAUTERUCCI, SR.


_____

Robert K. Nealon, Individually and as

Unconditional and Continuing Guarantor

_____

Phillip H. Krause, Individually and as

Unconditional and Continuing Guarantor


_____

J. Gregory Cauterucci, Sr., Individually and as

Unconditional and Continuing Guarantor


_____

Vincent E. Fisher, individually and

Limited Guarantor


_____

Louis J. Capozzi, individually and

Limited Guarantor

40

**GUARANTORS:**

**CARE FIRST MANAGEMENT, LLC**

a Pennsylvania limited liability company

Unconditional and Continuing Guarantor

By: _____

Its: PRESIDENT

Name: J. GREGORY CAUTERUCCI, SR.

_____

Robert K. Nealon, Individually and as

Unconditional and Continuing Guarantor

_____

Phillip H. Krause, Individually and as

Unconditional and Continuing Guarantor

_____

J. Gregory Cauterucci, Sr., Individually and as

Unconditional and Continuing Guarantor

_____

Vincent E. Fisher, individually and

Limited Guarantor

_____

Louis J. Capozzi, individually and

Limited Guarantor

40

_____

John Y. Kim, individually and

Limited Guarantor


_____

Bina Mehta, individually and

Limited Guarantor


_____

David P. Leone, individually and

Limited Guarantor


_____

Victor J. Bierman III, individually and

Limited Guarantor


41

_____

John Y. Kim, individually and

Limited Guarantor

_____

Bina Mehta, individually and

Limited Guarantor

_____

David P. Leone, individually and

Limited Guarantor

_____

Victor J. Bierman III, individually and

Limited Guarantor

Formatted: Font: 8 pt

# EXHIBIT 'A'

PARCEL ONE:

ALL that certain lot or parcel of ground situate in the Eighth Ward of the City of Pittsburgh, County of Allegheny and Commonwealth of Pennsylvania, more particularly bounded and described as follows:

BEGINNING at the point of intersection of the northerly side of Baum Boulevard (60 feet wide) with the westerly line of property now or formerly of Morris Heyison; thence along the last mentioned line, North 18° 0' West 123.55 feet to a point on the line of land now or formerly of Elizabeth D. Kirk; thence along the last mentioned line, North 78° 38' West 33.39 feet to a point on the easterly side of Olga Way (20 feet wide); thence along the said side of Olga Way (20 feet wide), South 11° 22' West 28.60 feet to a point on the southerly side of Olga Way (20 feet wide); thence along the said side of Olga Way (20 feet wide), South 72° 0' West, 131.88 feet to a point on the line of land now or formerly of Howard Hanna Realtors; thence along the last mentioned line, South 18° 0' East, 115 feet to a point on the northerly line of Baum Boulevard (60 feet wide); thence along the last mentioned line, North 72° 0" East, 175 feet to the point at the place of beginning.

BEING known and designated as Block and Lot 51-H-46 in the Deed Registry Office of Allegheny County, Pennsylvania.

PARCEL TWO:

ALL that certain lot or piece of land situate in the Eighth Ward of the City of Pittsburgh, County of Allegheny and Commonwealth of Pennsylvania, bounded and described as follows, to-wit:

BEGINNING at a point on the Northerly side of Baum Boulevard, as now located and widened, at the property line between the premises herein described and the property now or late of L. C. Bibler; thence along the Northerly side of Baum Boulevard in a Northeasterly direction, Seventeen and seventy-three hundreds (17.73) feet to the point of a curve to the left; thence by said curve to the left, having a radius of Sixty (60) feet and central angle of 60 degrees 38 minutes, a distance of sixty-three and fifty hundredths (63.50) feet to a point on the Westerly side of South Fairmount Avenue; thence along the Westerly side of said Avenue in a Northerly direction Forty-six and sixty nine hundredths (46.69) feet to a line of property now or late of J. F. Kirk; thence by said Kirk property by line of right angles to South Fairmount Avenue in a Westerly direction, One hundred seven and nine hundredths (107.09) feet to line of property now or late of said L. C. Bibler; thence by said last mentioned line, which line is at right angles to said Baum Boulevard, One hundred twenty-three and eighty-two hundredths (123.82) feet to Baum Boulevard, the place of beginning.

BEING known and designated as Block and Lot 51-H-55 in the Deed Registry Office of Allegheny County, Pennsylvania.

PARCEL THREE:

ALL THAT CERTAIN LOT OR PIECE OF GROUND situate in the 8th Ward of the City of Pittsburgh, County of Allegheny and Commonwealth of Pennsylvania bounded and described as follows, to-wit:

42

BEGINNING at a point on the Northwesterly side of Fairmount Avenue distant 87.51 feet Northerly from the Northwest corner of Baum Boulevard and Fairmount Avenue; thence Westwardly at a right angle to Fairmount Avenue 140 feet to the line of Olga Alley; thence Northwardly along line of said Alley 40 feet to land of Mrs. Lucy D. Montgomery; thence Eastwardly at a right angle to said Alley, along the line of said Mrs. Lucy D. Montgomery 140 feet to Fairmount Avenue; thence Southwardly along the line of Fairmount Avenue 40 feet to the place of beginning.

BEING known and designated as Block and Lot 51-H-60 in the Deed Registry Office of Allegheny County, Pennsylvania.

PARCEL FOUR:

ALL that certain lot or piece of ground situate in the Eighth (8th) Ward of the City of Pittsburgh, County of Allegheny and Commonwealth of Pennsylvania bounded and described as follows, to-wit:

BEGINNING at a point on the western side of Fairmount Avenue, also known as South Fairmount Avenue, distant northwardly from the corner of Baum Boulevard 127.51 feet; thence northwardly along the line of Fairmount Avenue 40 feet to a point; thence westwardly at a right angle to Fairmount Avenue, 140 feet to line of Olga Way; thence southwardly along the line of Olga Way, 40 feet to a point, and thence eastwardly at a right angle to said Way, 140 feet to Fairmount Avenue aforesaid, at the place of beginning.

BEING known and designated as Block and Lot 51-H-62 in the Deed Registry Office of Allegheny County, Pennsylvania.

# EXHIBIT "B"

(a)     all Accounts, all Inventory, all Equipment, all General Intangibles, and all Investment Property;

(b)     all instruments, chattel paper, electronic chattel paper, documents, securities, moneys, cash, letters of credit, letter of credit rights, promissory notes, warrants, dividends, distributions, commercial tort claims, contracts, agreements, contract rights or other property, owned by Debtor or in which Debtor has an interest, including but not limited to, those which are now or hereafter in the possession or control of Secured Party or in transit by mail or carrier to or in the possession of any third party acting on behalf of Secured Party, without regard to whether Secured Party received the same in pledge, for safekeeping (excluding resident trust funds and agency accounts held for the benefit of residents), as agent for collection or transmission or otherwise or whether Secured Party had conditionally released the same, and the proceeds thereof, all rights to payment from, and all claims against Secured Party, and any deposit accounts of Debtor with Secured Party, including all demand, time, savings, passbook or other accounts and all deposits therein;

(c)     all assets and personal property now owned or hereafter acquired; all now owned and hereafter acquired inventory, equipment, fixtures, goods, accounts, chattel paper, documents, instruments, farm products, general intangibles, supporting obligations, software, and all rents, issues, profits, products and proceeds thereof, wherever any of the foregoing is located, excluding certain property subject to a purchase money security interest and which is expressly permitted pursuant to the Loan Agreement;

(d)     all fixtures of every kind and nature located or to be located at Allegheny County, Pennsylvania at the real property owned by Debtor and described on <u>Exhibit A</u> attached hereto and incorporated herein by reference;

(e)     all minerals or the like and accounts relating from sales at the wellhead or minehead, as well as all standing timber which is to be cut and removed under a conveyance or contract for sale, all as located on or related to the real property described on <u>Exhibit A</u> attached hereto and incorporated herein by reference; and

(f)     all right, title and interest in and to the operating rights of the sixty four (64) long-term care nursing home beds licensesd by the Pennsylvania Department of Health, certificate of need, the rights to operate nursing home beds, the right to apply for a license to operate said beds, the right to seek Medicare and/or Medicaid certification, all licenses, permits, certifications, franchises, agreements, provider agreements, provider numbers, third party payor agreements, with respect to, or as a result of, any of the foregoing, and all incidental, supplemental, related and ancillary rights attendant to, or in connection with, any of the foregoing.

44

## EXHIBIT "C"

### Permitted Encumbrances

Nursing Home Lease dated November 1, 2006 by and between Innovative Healthcare Properties, LLC, as Lessor and Residence For Renal Care at Shadyside, Ltd., as Lessee.

Nursing Home Sublease dated November 1, 2006 by and between Innovative Healthcare Properties, LLC, as Lessor and Residence For Renal Care at Shadyside, Ltd. as Lessee and Center for Renal Care at Shadyside, Ltd. as Sublessee.

45

## EXHIBIT "D"

### Insurance Requirements

Same as the insurance requirements set forth in that certain Nursing Home Lease dated November 1, 2006 by and between Innovative Healthcare Properties, LLC, as Lessor and Residence For Renal Care at Shadyside, Ltd., as Lessee and that certain Nursing Home Sublease dated November 1, 2006 by and between Innovative Healthcare Properties, LLC, as Lessor and Residence For Renal Care at Shadyside, Ltd. as Lessee and Center for Renal Care at Shadyside, Ltd. as Sublessee.

# EXHIBIT "E"

## BORROWING BASE CERTIFICATE